Cherry Press, Inc. and Patrick J. McGinnis, Receiver of Cherry Press, Inc., Appellants, *v.* The Redevelopment Authority of the City of Philadelphia, Appellee.

48

Argued October 4, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Thomas B. Rutter,* with him *Adelman & Lavine,* for appellants.

*Peter A. Galante,* with him *James D. Crawford,* for appellee.

OPINION PER CURIAM, November 19, 1973:

The order of the lower court is affirmed upon the opinion of Judge BARBIERI which, not being reported elsewhere, is as follows:

OPINION

BARBIERI, J.:

This is an eminent domain case in which the issues before the Court arise out of what is alleged to be a condemnation and "taking" of property of Cherry Press, Inc. (Cherry) by the Redevelopment Authority of the City of Philadelphia (Authority). At the time when the taking was claimed to have occurred, Cherry was a tenant in a multi-story industrial building known as the Glynn Building located at 414-16 North Third Street, Philadelphia, Pennsylvania. Certain real estate in the area had been condemned with an appropriate declaration of taking publicly filed as of August 2, 1968, known as the "Callowhill East Urban Renewal Area." That public taking specifically excluded certain buildings in a small area of the general taking, including the Glynn Building. Subsequently, the Authority took title to the Glynn Building by deed pursuant to an agreement of sale dated December 9, 1969, under which settlement was made on January 7, 1970. Included in the purchase of the property for $390,000 was an assignment of leases of all tenancies in the building including Cherry's. Cherry's lease agreement, dated September 1, 1960, provided for an initial term of five years, with a one year term, renewable from year to year thereafter for failure to give notice of termination ninety days prior to the end of any such annual term. The annual term in effect as of January 8, 1970, when the lease was assigned, was terminable as of September 1, 1970, by either party,

by the Authority or by Cherry, upon giving of the ninety days' notice.

Since neither the Authority nor Cherry gave notice, the tenancy of Cherry was automatically renewed for an additional term of a year. Then, on April 15, 1971, well within the ninety days' period of notice required in order to terminate as of September 1, 1971, notice to vacate was sent to Cherry. It is this notice to vacate given on a form letter used in condemnation cases that Cherry claims is a notification that, in itself, constituted a "taking" within the meaning of the Eminent Domain Code of 1964.* Although this letter called for vacating the premises "within Ninety (90) days from the date of service of this notice . . . ," which would have called for relinquishment of possession before September 1, 1971, the end of the current term, possession was not required by the Authority and was not surrendered by Cherry until February of 1972.

The extensive litigation that evolved following the vacating of the premises by Cherry took two directions. The first line of proceedings arose out of a stipulation of counsel dated December 22, 1971 and filed on January 31, 1972, docketed to the "taking" caption as of July Term, 1968, No. 2535, and the second was filed by Cherry for Board of View treatment as of March Term, 1972, No. 490. We will briefly outline the course taken in each of these proceedings which are both captioned in the litigation now pending before this court.

The first course of proceedings, as noted, was initiated by the stipulation filed in the Callowhill East condemnation matter of 1968. This stipulation appears to have been presented in connection with certain Amended Preliminary Objections to the Declaration of Taking filed by the Authority. The judge who had the preliminary objections before him marked the stipulation

---

* Act of June 22, 1964, P. L. 84, 26 P.S. 1-101 et seq.

"APPROVED," and then signed an "AMENDED ORDER" overruling the preliminary objections ". . . without prejudice to plaintiff's rights to file a Petition for a Board of View to determine damages, if any, sustained by the lessee/tenant, Cherry Press, Inc., occupant of premises 406-416 North Third Street, Philadelphia, Pennsylvania. The Court makes no substantive ruling on the Alternative Motion for Judgment contained in the Amended Preliminary Objections, the same not being before the Court in proper form."

In the stipulation it was stated that the Authority, after an appraisal which fixed the value of Cherry's loss at $744,450.00, had made an offer "to the condemnee in full settlement of its claims, $705,000.00 . . . ," which offer allegedly was accepted on August 5, 1971. The stipulation further avers that "on or about September 15, 1971, the Legal Division of the Redevelopment Authority advised condemnee that the settlement would not be consummated, as agreed, on or before September 30, 1971, and that the Redevelopment Authority would take the position that it had not condemned this premises and is not liable to pay any compensation to Cherry Press, Inc." Despite this averment of the Authority's legal contention that no condemnation had taken place, the stipulation, nevertheless, was signed by an attorney for the Authority and an attorney for Cherry. Paragraph 3 contains the following: "3. By Declaration of Taking filed in this proceeding on August 2, 1968, the Redevelopment Authority condemned real estate lying within the Callowhill East Urban Renewal Area pursuant to an Urban Renewal Plan *requiring subject premises to be demolished in part, reconstructed in part, and requiring all tenants of subject premises, including Cherry Press, Inc., to be dispossessed.*" (Emphasis added.)

The emphasized language in the above quotation states an untruth in the light of the record in this case.

As we have noted, plaintiff's leasehold interest was not affected by the 1968 taking.

Although the order containing the "without prejudice" statement was dated March 10, 1972, the record indicates that a petition for Board of View was filed on March 8, 1972.* This petition for a Board of View was rejected by the Board, marked "VOID," on the ground that there had been no condemnation to support the petition.

The next step in the morass of litigation in this case, in which at least five judges of this court have participated at one time or another, took the form of a rule entered on May 2, 1972 to show cause why the Authority, named as "condemnor," should not make settlement and payment pursuant to the stipulation filed on January 31, 1972. Testimony was then taken at length before CODY, J., which resulted in an order by him dated May 9, 1972, that there had been a condemnation and taking by the Authority "of the property of Cherry Press, Inc., condemnee, by eminent domain; that the condemnee is entitled to just compensation caused by the taking; and that there has been no binding agreement between the condemnor and the condemnee as to the nature and amount of such compensation." Judge CODY's order discharged the rule of May 2, 1972, "without prejudice," and noted that "the parties having agreed to waive proceedings before a Board of View, in accordance with the provisions of Section 520 of the Eminent Domain Code, they are hereby directed to proceed forthwith to trial before a judge and jury to determine the amount of compensation due the condemnee under the provisions of the applicable sections of Article VI as amended of the Eminent Domain

---

* As previously noted, the Board of View matter was assigned to March Term, 1972, No. 490, whereas the original docket to August Term, 1968, No. 2535, represents the term and number assigned originally at the time of the Declaration of Taking.

Code, and to be prepared to proceed with such trial not later than Monday, May 15, 1972."

The portion of this order which holds that there was a "condemnation and taking" by the Authority is actually at variance with certain unequivocal testimony offered on behalf of the Authority in the hearing before Judge CODY. An explanation is provided by Cherry's counsel in his latest brief, as follows: "First, it must be remembered that Judge CODY's Order finding a condemnation arose after two days of hearings on a Petition to enforce a settlement agreement between the Authority and Cherry Press, Inc. In exchange for Cherry Press' agreement not to insist on the settlement previously agreed upon, the Authority agreed to withdraw its contention that there was no condemnation. In a word, the Authority's present position is an attempt to renege on an agreement entered into in the context of ongoing litigation."

The "settlement agreement" referred to does not appear of record by testimony or stipulation. Such an agreement, however, while it would account for the terms of the order, would not, in our view, have the legally binding effect contended for by Cherry. If Judge CODY was simply approving an agreement as the plaintiff asserts, then the approval would be just as vulnerable as was the stipulation of December 22, 1971. Thus, if counsel's agreement was based upon foundations illegally advanced, the order could have no *res judicata* effect. In fact, this same issue involving the same uncondemned area in which the Glynn Building is located was before the Commonwealth Court in the case of *Redevelopment Authority of the City of Philadelphia v. L. & A. Creative Art Studio, Inc.*, 6 Pa. Commonwealth Ct. 326, 294 A. 2d 606 (1972). In that case, as in this one, an agreement or stipulation of counsel was relied upon to support a condemnation claim for $115,000.00, whereas the Authority contended there, as it does here,

that no condemnation had taken place. In sustaining the appeal from entry of judgment in the amount of $115,000.00, Judge BLATT, writing for the six judges who sat on the appeal, states: "We believe, therefore, that remanding this matter to the lower court for an evidentiary hearing will permit that court to ascertain whether or not in fact there was a valid settlement agreement between the Authority and the appellee. Additionally, the lower court may then ascertain if the Authority was permitted, or should be permitted, to amend its Answer. If amendment is permitted, the issue as to whether or not the property had in fact been condemned could be considered. *Certainly in a matter involving such a large amount of the taxpayers' money, we should not hesitate to take all the steps necessary to insure that justice is done, even if some delay is caused thereby.*" (Emphasis added.)

In any event, the trial portion of these proceedings as directed by Judge CODY was assigned and was proceeded with before the undersigned beginning May 15, 1972. At the conclusion of the trial, on May 19, 1972, the jury returned a verdict of $300,000.00 in favor of the plaintiff. Judgment has never been entered on the verdict, because the following procedural steps were taken by the parties, many of which are pending and are now ready for disposition:

(1) A petition was filed by Cherry's counsel seeking counsel fees, witness fees and costs in the total of $110,417.35,** sought to be paid by the Authority in addition to the verdict amount of $300,000.00. Answer was filed by the Authority.

(2) A petition was filed by the City of Philadelphia for leave to intervene in the action in order to oppose the plaintiff's counsel fee and costs petition.

---

** Counsel fee of $105,132.00 is claimed per Contingent Fee Agreement filed.

(3) A separate proceeding was instituted by the City of Philadelphia against the Authority,*** in which an investigation was ordered on July 5, 1972, and a Special Investigator was appointed to investigate allegations of misconduct in the Authority's activities and report back to the court. A preliminary report of the Special Investigator filed on September 1, 1972, contains factual assertions which raised questions concerning the propriety of the condemnation apparently agreed upon before Judge CODY and formalized by his order of May 9, 1972, and this led to the next petition. Answer to this petition was filed by the Authority.

(4) A petition by the Authority for leave to file a Motion for New Trial *Nunc Pro Tunc*. This petition sought to review the verdict of May 19, 1972 on grounds brought out by the investigation in the City's suit. Cherry filed an answer and also preliminary objections in the Nature of a Demurrer.

(5) A MEMORANDUM and ORDER was filed by this court on December 28, 1972, directing the holding of an evidentiary hearing as to the circumstances giving rise to the alleged condemnation of Cherry's property.

(6) Legal arguments were heard on January 4, 1973, and the evidentiary hearing, as ordered, was held on January 5 and 8, 1973.

(7) A petition by the Authority was filed after the evidentiary hearing of January 5 and 8, 1973, asking leave to amend the Authority's previous petition for a New Trial. This petition sought leave to file, *Nunc Pro Tunc*, a Motion for Judgment N.O.V. Cherry filed answer to the Authority's petition to amend.

It is obvious that the disposition of all of these pending matters will depend upon what rulings are made

---

*** City of Philadelphia v. Philadelphia Housing Authority and Redevelopment Authority of the City of Philadelphia, June Term, 1972, No. 4747.

by this court upon the petitions for *nunc pro tunc* consideration of motions for new trial and for judgment N.O.V. These rulings in turn will be governed by what findings are made upon the evidence adduced at the hearings on January 5 and 8, 1973. Further, it is the opinion of this court that the *nunc pro tunc* motions, if granted, may properly reach the two parts of the bifurcated trial: the portion tried as to condemnation before Judge CODY and the portion as to damages tried before the undersigned. The findings and conclusions which follow, therefore, will be rendered as to both phases of the trial as influenced by the post-trial testimony adduced at the hearing held on January 5 and 8, 1973. As so viewed, the court makes the following

### FINDINGS OF FACT

1. The 1968 public and recorded declaration of taking involved in this case specifically excluded the subject property from the taking and from any condemnation by the Authority.

2. Title to the real estate and Cherry's leasehold interest was acquired by the Authority through deed and assignment of Cherry's lease.

3. Dispossession of Cherry was by agreement pursuant to a notice to vacate timely given under the terms of the lease.

4. Cherry retained possession for a period of months following termination of its lease agreement and its leasehold interest.

5. Cherry suffered no damages from actions of the Authority by condemnation or otherwise.

### DISCUSSION

First of all, as previously noted, the scope of our present review properly encompasses the two phases of the trial, the condemnation phase before Judge CODY and the damage trial before the undersigned. Our con-

clusion in this regard fully disposes of the plaintiff's contention that this court is now bound by Judge CODY's order of May 9, 1972.

Cherry further contends that even if that order is not legally binding now, it should be honored because it was based upon some form of undocumented agreement, and that to disregard this unrecorded understanding would permit the Authority to "renege on an agreement entered into in the context of ongoing litigation." We read this contention to be that this court must enforce an agreement or an order based on one, even where to do so would work a fraud upon the Authority. Obviously, we cannot subscribe to any such contention. As Judge BLATT indicated in the *L. & A.* case, *supra*, ". . . we should not hesitate to take all the steps necessary to insure that justice is done . . . ," rather than blindly act without consideration of consequences pursuant to an agreement of counsel that is contrary to fact.

Cherry also argues in support of what may be its major contention that regardless of the lease termination as of September 1, 1971, Cherry's vacating of the premises was not voluntary but was due to a legally cognizable condemnation or taking. This "taking," Cherry argues, was effected by the simple fact that the standard 90 days' notice was sent on April 15, 1971, and this would have required the surrender of possession on or before August 15, 1971, fifteen days before possession could have been required under the lease. Unfortunately for this theory, it is not supported by the law of Pennsylvania. That law quite logically and fairly is that when the taking agency is the landlord no damage results to a tenant who is permitted to remain in possession until the end of the current lease. In this case, accordingly, no compensation would be payable because the tenant suffered no loss since it was

permitted to remain in possession well past the end of the then current term.

The ruling case on this point is our Supreme Court case of *Fisher v. Pittsburgh Public Parking Authority*, 433 Pa. 113, 248 A. 2d 849 (1969), in which, as in this case, the Authority purchased the property by private negotiation and sale rather than by statutory condemnation. The lessees were allowed to remain on the premises until each of their leases expired. The plaintiffs contended in that case, as Cherry does here, that by acquiring title privately while they were in actual possession under their leases, the deed acquisition must be treated as a condemnation, for otherwise they would be unjustly deprived of the kind of dislocation damages which would have been due them if an actual condemnation had taken place. The Court disagreed, stating: "There is no merit in plaintiffs' contention. A tenant whose lease has expired is not a condemnee under the Eminent Domain Code . . . When their lease expired, plaintiffs no longer had any property interest in the premises, nor was there any interference with or deprivation of their possession or the beneficial use or enjoyment of their leasehold interests. When a tenant's lease terminates prior to condemnation, the tenant suffers no compensable injury . . . It is even clearer that a tenant whose lease has terminated suffers no compensable injury where the Authority purchases instead of condemns the land." (pp. 115 and 116)

Furthermore, as the Authority here points out, the legislation under which it was created has specifically endowed it with the right to acquire property by purchase. Section 9 of the Urban Redevelopment Law,* contains authority powers including two subsections which read: "(h) To assemble, purchase, obtain options upon, acquire by gift, grant, bequest, devise or other-

---

* Act of May 24, 1945, P. L. 991, as amended, 35 P.S. 1709.

wise any real or personal property or any interest therein from any person, firm corporation, municipality or government: Provided, That no real property, located outside of a redevelopment area, which is not necessary to the corporate purposes of the Authority nor necessary to the successful redevelopment of a redevelopment area, shall be purchased by the Authority;

"(i) To acquire by eminent domain any real property, including improvements and fixtures for the public purposes set forth in this act, in the manner hereinafter provided, except real property located outside a redevelopment area; . . ."

It is obvious from the above that eminent domain acquisitions are clearly meant to be separate and in addition to other acquisitions requiring no condemnation. To adopt plaintiff's contention that a purchase is the same as a condemnation would make nonsense of the above-quoted language in the Urban Redevelopment Law, a construction which we are required to avoid. See Statutory Construction Act, Sections 52 and 58, (46 P.S. 552, 558). Section 58 specifically provides that legislative provisions "conferring the power of eminent domain" . . . "shall be strictly construed."

Also, since the leases were assigned to the Authority in this case as part of the purchase transaction, Cherry's view reaches the absurdity of maintaining that the Authority must be deemed to have condemned its own property. Mr. Justice ROBERTS' remarks in his concurring opinion in *Fisher* are pertinent: "I believe that since this entire transaction was achieved through private negotiation and sale, no question is presented under the Eminent Domain Code. Recovery under the Eminent Domain Code, by a tenant or otherwise, in my view is possible only after an eminent domain proceeding has been brought and where someone is a 'condemnee.' Cf. Shippingport Ferry Company Appeal, 432 Pa. 176, 247 A. 2d 466 (1968) (concurring opinion)."

We have no hesitation in holding, even if *Fisher* could be distinguished as Cherry urges that it can, that the letter of April 15, 1971, regardless of its language, could not, *per se,* amount to a condemnation or taking. The contention that it would is not only contrary to fact and without support in the eminent domain law of Pennsylvania, but such a fictitious "taking" would be in the teeth of established private property concepts which we cannot ignore. It must be remembered that all property owners are not willing condemnees, or openly seeking condemnation as Cherry appears to have done in this case. The taking of private property, even by a governmental agency with eminent domain powers, must comply with some form of due process of law. Our Eminent Domain Code contains many safeguards in ARTICLE IV, "Procedure to Condemn," wherein are provided certain required formal procedures, security by bond for the use of the property owner, the requirement of a specific and detailed notice to the condemnee in addition to the public declaration of taking; and, most important of all, Section 406 provides for Preliminary Objections in a detailed and complete sweep encompassing every possible form of defense against any improvident condemnation or taking. Cherry's suggested idea that there may be "condemnation by letter" would, of course, deprive a property owner of his defenses under the Code.

If it is argued that condemnation or taking by letter alone should be sanctioned for the benefit of only such owners as wish to profit thereby, no case better than this one could be found to illustrate what an enticement to fraud such a procedure would provide. Condemnation procedures should not disregard all forms of due process, either to irresponsibly serve the wishes of a willing property owner or to neglect the property rights of an unwilling one. The avenues for fraud by agency officials is obvious unless formal procedures are

adhered to, and this court has been unable to discern any reason why officials or employes of an authority or agency with eminent domain powers should not be held to as a high a fiduciary responsibility as are other public fiduciaries and their staffs.

The Authority has briefed this fiduciary responsibility point in depth and at some length, documenting its contention that even if "the notice to vacate amounted to an act of condemnation, said actions by RDA representatives were adverse to the public welfare, and the Court must intervene to rescind the same." We do not question the validity of the legal principles contended for by the Authority, but refrain from passing upon their application to the circumstances in this case, in view of our holding here that no condemnation took place. Thus, we need not, and do not, reach the question of whether or not fraudulent conduct was the foundation on which the alleged condemnation and damage claims in this case were based.

We are not unmindful that damages from takings may be suffered by those holding property rights without any *de jure* condemnation proceedings having been instituted with relation to such interests. No such *de facto* taking or damage is involved here and the plaintiff does not contend that it is.* Plaintiff, Cherry, here contends that there was an actual *de jure* taking. As we have indicated, we cannot agree.

Finally, plaintiff argues what appears to be a sympathy plea on behalf of Cherry. Cherry's brief contains the following: "Here, the *innocent* and injured parties are Cherry Press, Inc. and its creditors who are being delayed in affecting a plan of reorganization by virtue of the Authority's attempt to renege on prior commitments before this Court and the Authority's attempt to

---

* See *Conroy-Prugh Glass Co. v. Commonwealth, Dept. of Tr.*, 7 Pa. Commonwealth Ct. 66, 298 A. 2d 672 (1972).

avoid legal obligations by claiming *unilateral* mistake."
(Emphasis added.)

We question the view that Cherry was either "innocent" or that the program of procedures on his behalf to have him receive payment of $700,000 out of Authority funds was "unilateral" in the sense that he took no part in the ramified activities on which the alleged condemnation was predicated. In the course of the damage trial before the undersigned, the following testimony was given by Cherry's real estate agent, Lester Krawitz: "Q. Commencing in the year 1970 when Glynn Realty was no longer owner, did you have any consultation or conference with Mr. Cherry? A. I had several conversations with him prior to that date and after that date. Q. What was that in reference to? A. Prior to the date Mr. Cherry had been operating on the seventh floor and the basement and found it very unsatisfactory, and he asked me to be on the lookout for a one-story or one-floor building of about 20,000 feet so he could make a move and consolidate his operation. That would be back in 1966 or 1967.

"In conversations after that, I indicated to him that although this building was exempted from being taken by the Redevelopment Authority, I was in the process of appealing to them to take this building as part of their project, Callowhill East, and if this exigency took place he would be better off to stay in the building because he would get machinery and equipment damages and moving expenses and so forth. And I believe he agreed with me. Q. Did he remain there? A. Yes. He stayed in the building for that period of time and even after the Redevelopment Authority acquired it."

While we might feel sympathy for Cherry's ultimate plight, we cannot on such an emotional basis confer upon him property rights and damages which are not his under the applicable facts and law. If his gamble failed to result favorably to him, or he is the victim of

bad advice from his agents, resulting hardships rest with him and his advisers and may not be relieved at the expense of the Authority.

Because of the conclusions reached by the court which will follow, relief will be granted to the Authority. An award of a new trial would be an idle act, indeed, where as Mr. Justice Roberts said in *Fisher* "no question is presented under the Eminent Domain Code." Also, as it now appears, the relief granted is by way of review of the non-jury phase of the trial, as to whether or not there was a condemnation, which resulted in the order of May 9, 1972. We believe that the procedural steps taken by the Authority, although directed at what is truly a *sui generis* state of affairs, may form the basis for an appropriate disposition of the entire matter without a new trial or other futile litigation. Since no judgment has ever been entered on the jury verdict we conclude that *nunc pro tunc* consideration is warranted whereby judgment may now be entered in favor of the Authority.

## Conclusions of Law

1. The subject property in this case, the property of the tenant, Cherry Press, Inc., was not condemned or otherwise taken by the Authority within the meaning of the eminent domain laws of Pennsylvania.

2. The vacating of the subject premises by Cherry was legally and properly carried out under the terms of the lease agreement and did not give rise to any claim for damages under the eminent domain laws of Pennsylvania.

3. Any payment to Cherry by reason of his vacating the premises if made on the basis that Cherry suffered damages through an alleged condemnation, would be illegal and fraudulent under the facts and circumstances in this case.

4. The prior determinations in this case that a condemnation took place; that damages were due therefor; and that the jury's verdict in the sum of $300,000.00 represents a valid assessment of Cherry's alleged damages, were based upon unfounded agreements and were otherwise without factual or legal support in the record of this case, viewed in its entirety, and particularly as amplified by the evidentiary hearing of January 5 and 8, 1973.

5. In the interests of justice, and in order to avoid fraud, the Authority's motion for judgment should be granted.

### ORDER

AND Now, this 23rd day of March, 1973, it is order [sic] that

(1) The petition of The Redevelopment Authority of the City of Philadelphia for leave to have its motion for judgment considered *Nunc Pro Tunc* is granted;

(2) The motion for judgment is granted and judgment is hereby entered in favor of the defendant, The Redevelopment Authority of the City of Philadelphia.

Rulings will not be made upon other pending matters, since all of them are deemed to be moot in the light of the judgment entered herein.