Augustine, Appellant, *v.* Augustine.

Argued April 9, 1974. Before WATKINS, P. J., JA-COBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Edward A. Witt,* with him *Witt & Witt,* for appellant.

*Ronald P. Koerner,* with him *Gatz, Cohen, Segal & Koerner,* for appellee.

OPINION BY HOFFMAN, J., June 21, 1974:

The parties were married on June 8, 1968. Three months later, on September 15, 1968, their son, Sean Augustine, was born. As a result of marital difficulties, the parties are now separated and in the process of a divorce action. The subject of the dispute presented to this Court is the custody of the now five-year old child.

Both parties provided contradictory versions of the factual setting of the dispute at the custody proceeding on August 24, 1973. The record reveals that the problems of the case can be traced to the very roots of the marriage. The father testified that he never loved his wife and married her solely because she was pregnant. He said that since the birth of their son his wife neglected the child to the point of exposing him to great peril. He said that she left Sean in his crib for hours

on end and ignored his screams, while reading "her books". He described an incredibly callous and lethargic individual who refused to do housework and left dishes in the kitchen sink for days and weeks at a time. When the parties separated in June of 1970, the child remained with the father, while the mother failed to inquire, talk to or visit her son except on one occasion for a "couple of hours" during a period extending to May, 1971. While the mother admitted this lapse in her contact with her son, she denied neglecting him or the housework as her husband described it; she insisted that she loved her son and only failed to see him during the year's separation because she feared the child's father. She testified that she worked as a clerk and French translator, and had no assistance from her husband with either the care of the child or in the housework. She testified that her husband's resentment at being compelled to marry her showed in his daily scorn, apathy, and both mental and physical abuse toward her. She said that he often struck her with "flailing fists".

After a period of two years during which the parties once again lived together, the Augustines separated on June 2, 1973. This time the mother took Sean and went to live with her parents in Falls Church, Virginia. Mrs. Augustine described her parents as loving individuals able to care for her son and provide a happy and healthy home. The maternal grandparents live in a recently-constructed and comfortable split-level home. The child has his own bedroom. The grandfather is a diplomatic aide of enormous practical experience and education. His position with the Department of State has taken him to foreign countries during many of his years of diplomatic service. On cross-examination, it was admitted, however, that the grandmother had suffered from "a drinking problem", but that she had not

had a drink in "a few weeks". On July 3, 1973, Mr. Augustine went to Falls Church and without prior notice took Sean back to Pittsburgh.

Both parties now work. Although the marriage seems to have brewed a pot of marital troubles, both parties are able to provide a healthy atmosphere, where the child may make friends, eat and sleep in a fine home, and have the expressed love of his parents. Since both parties are at work during the business day, the ability and influences of "caretaker" parents must be examined. When the father is working as a salesman, his sister, the child's aunt, cares for the child in what appears to be a warm atmosphere. While the mother works, the child's maternal grandparents care for him.

It must be remembered: "In *all* child custody cases, . . . the welfare and best interests of the child predominate." *Commonwealth ex rel. Rainford v. Cirillo,* 222 Pa. Superior Ct. 591, 596, 296 A. 2d 838, 840 (1972).

We are involved here with the life of a five-year old child. A child of this age is generally considered to be one of "tender years." We have often held that the interest and well-being of a child are normally best served in the care and custody of the natural mother. *Commonwealth ex rel. Logue v. Logue,* 194 Pa. Superior Ct. 210, 166 A. 2d 60 (1960). This so-called "tender years presumption" is not determinative of each case. As our Supreme Court said in *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 108, 296 A. 2d 625, 627 (1972) : " 'While it is generally held that, other factors being equal, a child of tender years should be with the mother, this rule is by no means absolute. Each case must finally rest upon and be determined by its own facts.' Commonwealth ex rel. McLeod v. Seiple, 193 Pa. Superior Ct. 131, 136 (1960). The mother's right to custody is not absolute, but must yield to the welfare of the child. Commonwealth ex rel. Bell v. Bell, 200 Pa. Superior Ct. 646, 189 A. 2d 908 (1963)."

The lower court awarded custody to the father. The opinion of the court mentions the countervailing policy considerations of favoring the mother because of the tender years doctrine and in favoring the Pennsylvania resident (the father) over the parent who wishes to remove the child outside the jurisdiction of the Court.[1] See, *e.g., Shoemaker Appeal,* 396 Pa. 378, 152 A. 2d 666 (1959); *Brown v. Brown,* 206 Pa. Superior Ct. 439, 213 A. 2d 395 (1965). While the *actual* reasons for giving the minor child to the father are not evident from the opinion, it appears that the decision was grounded on what the lower court alludes to as "compelling reasons [which] may be found in actions and conduct of the mother that affect the spiritual, physical, emotional and moral well-being of the child." [citing *Commonwealth ex rel. Carpenter v. Carpenter,* 189 Pa. Superior Ct. 297, 150 A. 2d 724 (1959)].

After reviewing the evidence with an obvious belief that the father's testimony concerning his wife's neg-

---

[1] While the tender years presumption has lost some of its impact and vitality, see, *e.g., Commonwealth ex rel. Grillo v. Shuster,* 226 Pa. Superior Ct. 229, 235-236, 312 A. 2d 58 (1973), it remains the law that, all things being equal, the child's custody will remain in the natural mother, although the more probable situation is one where one party will demonstrate by the weight of the evidence that he or she can provide a home better suited to the "welfare and interest of the child." *Grillo,* supra at 236.

While the policy to favor the Pennsylvania resident over the nonresident, all things being equal, has been expressed in recent decisions, all silently determined as recently as 1972, see *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 296 A. 2d 625 (1972), it is difficult for this Court to recognize the logic or fairness of such a doctrine. It is, after all, presumptuous of this Commonwealth and in derogation of the equal stature of "sister states" to declare such a proposition. We should be ever mindful of the child's interests in these cases. Where all factors are equal, and a conflict arises between the tender years presumption and the extrajurisdictional considerations, the former should prevail as it is grounded upon a well-recognized belief in the healthy atmosphere provided by the natural mother.

lect and indifference to her child was the true version of the situation, the lower court concluded: "It is the Court's considered opinion that the mother lacks the requisite mental maturity to adequately care for Sean, and the proposed life with the grandparents will not be in the best interests of the child."

The lower court proceedings indicate what we believe to be an undue emphasis on the past "harvest" of the "poisoned and damaged crop" of this marriage. We may not be oblivious to the apparent unceasing friction between the parties, who married because of "moral" duty rather than love. If the wife was somewhat neglectful of her household and motherly duties, who is to say whether the marital atmosphere did not contribute to or even cause the consequences? The inquiry below seems to have centered on the past conduct of the mother in resolving her present claim. This may not be done. As Judge Spaeth stated the dilemma in *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa. Superior Ct. 229, 232-233, 312 A. 2d 58, 61 (1973): "Consequently, the trial of a child custody case is likely to become an exploration of the mother's past conduct in an effort by the father to show that she is unfit to care for the child. Past conduct may be forgiven, for '[c]ustody must be determined on the basis of facts as they exist at the time of the habeas corpus hearing [citations omitted].' Commonwealth ex rel. Shipp v. Shipp, 209 Pa. Superior Ct. 58, 60, 223 A. 2d 906, 907 (1966). 'This principle has application even where there has been a serious lapse from moral standards by the mother, provided her past misconduct will not adversely affect the best interests of the child . . . .' [citations omitted] . . . [T]he proceeding is in danger of becoming an inquiry to determine whether the mother has forfeited her 'prima facie right' to custody . . . rather than being a dispassionate and comprehensive analysis of all alter-

natives, to find what solution is indeed in the best interests of the child."

The record herein describes in great detail the past conduct of the parties and leaves little if any basis for weighing the present capabilities of the parties to provide the child with a stable atmosphere. The lower court's reliance on the alleged "alcoholism" of the maternal grandmother is unsupported by anything more than allusion by the grandfather to a prior "drinking problem". We are unable to conclude from this record whether the mother's past conduct or the grandmother's drinking problem in any way are presently affecting the child's welfare or the degree of probability that they will receive as influential and detrimental factors.

Our scope of review in these cases is of the broadest type. *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A. 2d 380 (1972). "[While] we cannot nullify the fact-finding function of the hearing judge, we are not bound by a finding which has no competent evidence to support it." *Commonwealth ex rel. Gifford v. Miller*, 213 Pa. Superior Ct. 269, 274, 248 A. 2d 63 (1968). We believe the incompleteness of the record precludes our making an independent determination. Not only should the record be expanded to reflect a careful and comprehensive inquiry into the ability of these parents to provide a stable and healthy atmosphere for the child, but "the hearing judge should file in [this and] every custody case a comprehensive opinion reflecting a thorough analysis of the record as a whole and specifying the reasons for the ultimate decision." *Commonwealth ex rel. Grillo v. Shuster*, supra at 237.

The case is remanded with a procedendo.

WATKINS, P. J., would affirm on the opinion of the court below.