385 A.2d 373

**In re Adam LESKOVICH and Ronald Leskovich.**

**Appeal of Annette Leskovich FAZIO.**

Superior Court of Pennsylvania.

Argued Nov. 15, 1977.

Decided April 13, 1978.

350

Joanne Ross Wilder, Pittsburgh, with her Stewart B. Barmen, Pittsburgh, for appellant.

Gustave Diamond, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

Appellant contends that the lower court improperly denied her habeas corpus petition in which she sought to regain custody of her two children from appellee, her ex-husband and father of the children. We agree and, therefore, reverse the order of the lower court.

On June 3, 1976, appellant filed a petition for habeas corpus in the Court of Common Pleas of Washington County seeking to regain custody of her two sons. At hearings on

August 9, and 10, 1976, and September 14, 1976, the evidence showed that appellant and appellee were married on August 3, 1968, and divorced on May 31, 1973. A son, Ronald, was born of the marriage. Adam, appellant's other son, was born during her previous marriage. Appellee adopted Adam following an adoption proceeding held in the Orphans' Court Division of the Allegheny County Court of Common Pleas on November 29, 1971. At the time of their divorce, appellant and appellee entered into a "Property Settlement Agreement" which dealt, in part, with the custody of their sons. The agreement stated:

"1. The parties hereto agree that each of them shall have partial custody of the children of the marriage and during the period that said party had partial custody, the other party shall be entitled to unlimited visitation rights with said children. It is further understood and agreed that the partial custody of the father shall not exceed six (6) months during any one (1) year and shall not be exercised in any manner which will disrupt the children's attendance at school."

Following the separation of the parties in January, 1973, the children lived with appellant in the marital residence in Bellvue, Pennsylvania. In April, 1973, appellant sold the house and moved with the children into an apartment a half block away from the house. At that time, appellant worked as a display manager for a furniture store in Corapolis. A year and a half later in August, 1974, appellant purchased a house in Monroeville. The move was necessitated by a job promotion which required appellant to work at the Monroeville branch of the furniture store. She enrolled her children at an elementary school in Monroeville. Toward the close of 1975, appellant's employer, in response to financial reverses, changed the store hours and required appellant to work until 10:00 p. m., five days per week. Because these new working hours left appellant with little or no time with her children, she secured new employment in December, 1975. However, because her new place of employment was

55 miles from her home in Monroeville, appellant sold her house and moved, in April of 1976, to a condominium in Pennsbury Village, a section of Pittsburgh, situated within convenient commuting distance to her new employment.

During the period following the separation, appellee resided in Burgettstown, Washington County. He visited the children almost every weekend and, pursuant to an agreement of the parties, took the children during the summer of 1974 and 1975.[1] Following a domestic dispute between the parties in March, 1974, the children lived with appellee who enrolled them in a Burgettstown school. They remained with appellee until the beginning of the 1975–1976 academic year when they returned to appellant. During the period when the children resided with appellee, appellant visited approximately every third weekend. Appellee testified that following the summer of 1975, he visited appellant and the children much less frequently. He attributed this change to his desire for the children "to develop roots and permanence somewhere and develop a life somewhere . . . ."

Soon after moving into Pennsbury Village in April, 1976, appellant grew disenchanted with the condominium development and with the neighborhood.[2] The management of the condominium told her that if she forfeited her downpayment and relinquished possession on or before May 24, 1976, she could terminate her agreement to purchase the condominium unit. Appellant decided to take advantage of the management's offer.

Appellant had planned to remarry in November, 1976. However, because of the necessity of vacating her condominium unit, she and her fiance decided to get married on May

1. Appellee remarried in November 1, 1974. His new wife testified that she had grown to love the children and would be willing to resign from her current job if appellee were granted custody.

2. Appellant testified that her clothes had been stolen from the community laundromat, that fights had broken out at her sons school bus stop, and that youths regularly drove motorcycles throughout the development.

29, 1976,[3] and move to Alexandria, Virginia, where her fiance lived and worked. Realizing that a move to Virginia would cause a disruption in her sons' education, appellant contacted appellee and asked him if he would transport their children to and from school for the balance of the academic year and then deliver them to Virginia when appellee, his wife, and the children returned to the Pittsburgh area following a vacation.[4] Appellant then transferred the children to appellee with the understanding that appellee would return them to appellant during the beginning of July, 1976. Two days after appellee took the children, appellant found a hand-written letter from appellee inside of her front door which stated that appellee did not intend to return the children. In response to a question on direct examination as to why he took this action, appellee responded: "Okay. The original agreement may have been okay at that time when it was signed, the children were younger, six and three and it wasn't bad, but things have changed since then. There have been, I think, two major developments. One is, that I'm now remarried and can offer the children a mother and a home and just a total family." Appellee later explained: "What precipitated the whole thing, it was the end of April, she moved from Monroeville to Pennsbury Village. All I had done; not seeing them and wanting to give them a better home and that type of thing was all for waste, all for naught. So nothing happened then until I thought they were going to live there and I would have to make another adjustment, then, weeks later, in the middle of May, I got a phone call that she was getting married and moving to Virginia and wanted me to take the children and put them in school in Burgettstown. That was the straw that broke the camel's back. I couldn't let that go on and on. Being a

3. Appellant did remarry on May 29, 1976. Her new husband testified that he had developed a warm relationship with the children and would undertake custodian duties with enthusiasm.

4. In fact, appellant and her husband did not move to Virginia. Soon after they were married, appellant's husband accepted employment in Pittsburgh. On August 16, 1976, they moved into their present home in the North Hills area of Pittsburgh.

father I have to do what is best, what's in the best interest of my children."[5]

On June 3, 1976, appellant petitioned for a writ of habeas corpus requiring appellee to produce the children in court for a hearing so that the question of their custody could be resolved. After conducting a hearing, interviewing the children, and ordering the Child Welfare Services of Washington County to conduct an investigation, the lower court found that both parties could offer adequate physical and financial conditions for the custody of the children and that both parties love them and have the desire to assume the responsibility of raising them. However, the court considered that there were compelling reasons indicating that the children's best interests would be promoted by permitting them to remain with appellee. Accordingly, the court denied appellant's petition and placed the children in the permanent custody of appellee with reasonable visitation privileges to appellant. This appeal followed.

In custody disputes between parents, the primary consideration is the welfare and best interests of the child. *Commonwealth ex rel. Parikh v. Parikh*, 449 Pa. 105, 296 A.2d 625 (1972); *Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 369 A.2d 821 (1977); *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974); *Commonwealth ex rel. Bowser v. Bowser*, 224 Pa.Super. 1, 302 A.2d 450 (1973). In determining a child's best interests, a court balances the evidence presented by both parents and awards custody to the party, who, by a preponderance of the evidence, demonstrates that the best interests of the child would be best served by an award of custody. *Ramos v. Rios*, 249 Pa.Super. 487, 378 A.2d 400 (1977). On appeal, the scope of review of this Court is of the broadest type. *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1972); *Milligan v. Davison*, 244 Pa.Super. 255, 367 A.2d 299 (1976).

5. Appellee and his wife testified that their daily routine entails taking the children to her parents' home one mile from their residence at approximately 8:00 a. m. each day and returning after work when they all eat dinner. After dinner, appellee, his wife, and the children return to their home in Burgettstown.

In *Davidyan v. Davidyan*, 230 Pa.Super. 599, 603, 327 A.2d 145, 147 (1974), we stated: "Although we will not nullify the fact-finding function of the hearing judge, we are not bound by deductions or inferences made by the lower court from the facts as found. (citations omitted). We need not accept a finding which has no competent evidence to support it, but are instead required to make an independent judgment based on the evidence and testimony, and make such order on the merits of the case as do right and justice. (citations omitted)." *See also Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976); *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665 (1974); *Commonwealth ex rel. Rainford v. Cirillo*, 222 Pa.Super. 591, 296 A.2d 838 (1972).

In the instant case, the lower court appears to have grounded its decision upon two findings: first, the alleged adverse impact upon the children of appellant's unsettled living conditions during the period 1973 to 1976, and second, that appellee and his present wife are better able to provide for the children's physical, spiritual, intellectual, and moral well-being. We must, therefore, determine whether the hearing court's findings are supported by competent evidence. *Commonwealth ex rel. Myers v. Myers*, supra.

While it is true that appellant experienced a period of unsettled living conditions following her separation from appellee in 1973, we find that each move was dictated by financial necessity and concern for the welfare of her children. Although this instability led to the enrollment of the children in various schools, appellee admitted that he had not received any reports that the children had been performing poorly academically. Further, although the lower court concluded that appellant's relocations caused one of the children to suffer from emotional problems, our independent review of the record does not disclose any evidence of a causal connection between the child's emotional problems and appellant's unsettled living conditions. In fact, it is equally possible that any emotional difficulties experienced by the children stemmed from the trauma of their parents'

divorce and subsequent remarriages rather than the fact that appellant moved to three different communities in the Pittsburgh area in three years.

Moreover, we have often restated the rule that custody must be determined on the basis of the facts as they exist at the time of the habeas corpus hearing. *Augustine v. Augustine,* supra; *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 312 A.2d 58 (1973); *Commonwealth ex rel. Shipp v. Shipp,* 209 Pa.Super. 58, 223 A.2d 906 (1966). Therefore, even were we to concede that appellant's unsettled past had a deleterious effect on the children, we could not base a custody award on such a finding unless we could conclude that the past behavior had an ongoing negative effect on the children's welfare. Our own review of the record reveals, to the contrary, that since appellant remarried on May 29, 1976, her life has been characterized by the kind of stability and financial security which is conducive to providing for the well-being of her children. We find, therefore, that the lower court erroneously emphasized appellant's past conduct and omitted any reference to her present capability to provide her children with a stable environment. *Commonwealth ex rel. Cutler v. Cutler,* supra.

Furthermore, the lower court found "compelling reasons . . . which indicated the children's physical, spiritual, intellectual, and moral well-being" would be best served by granting custody to appellee. To the contrary, we find no evidence which demonstrates that appellee's home is any more well-suited to promoting the best interests of the children than that of appellant.

▉▉▉ As a result, we are constrained to conclude that the findings upon which the lower court based its award of custody are not supported by competent evidence.[6] Hence,

**6.** We note that on September 14, 1976, the hearing judge conducted separate interviews with both children. He properly allowed counsel to be present and had the proceedings transcribed. *Commonwealth ex rel. Tobias v. Tobias,* 248 Pa.Super. 168, 374 A.2d 1372 (1977); *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976); *Common-*

we are not bound by those findings. *Davidyan v. Davidyan*, supra; *Commonwealth ex rel. Gifford v. Miller*, 213 Pa.Super. 269, 273–274, 248 A.2d 63, 65–66 (1968).

There is one fact in the record that the lower court does not comment upon; the means by which appellee obtained custody. The record shows that in May, 1976, appellee concluded, unilaterally, that he could best serve the welfare of the children. Without the benefit of a neutral determination by a court as to who was better suited to be a custodian, appellee took the children and asserted that, henceforth, he would be their sole custodian. On cross-examination appellee stated: ". . . I felt all along I would get the children, custody of the children, because I didn't feel she would be capable of taking care of the children. Q: But she was taking care of the children, was she not? A: I don't think so . . . . For children who have been through a divorce and have all this instability, . . . all those moves and all those schools, it was too much of this insecurity that they have . . . ." It is noteworthy that even

*wealth ex rel. Grillo v. Shuster*, supra. Even though the children, aged 10 and 7 at the time of the interview, expressed love for their mother and fondness for her new husband, both stated that they preferred to live with their father and his new wife. We are aware that young children become strongly attached to those who stand in a parental relationship and who have tenderly cared for them. *Commonwealth ex rel. Cutler v. Cutler*, supra. However, we are not unmindful of the fact that a parent in possession of young children can exert subtle persuasion on them to influence their parental preference in order to facilitate the parent's chances of gaining custody. For example, in the instant case, the following exchange took place between the lower court judge and one of the children:
"Q. Did you and your dad and Bobbie Joe [appellee's wife] talk about coming in and talking to me today? . . . And did they ever say how you should answer me or what you should tell me?
"A. Yes.
"Q. What did they say?
"A. Tell them that you want to live here and I want to live there. Even if they didn't say that, I want to live here." Therefore, while we are certainly aware of the children's preference, we must be guided by the well-established rule in custody cases that the expression by a child of a wish to stay with a particular parent is a factor which should be considered, but is not controlling. *In re: Custody of Myers*, 242 Pa.Super. 225, 363 A.2d 1242 (1976); *Commonwealth ex rel. Holschuh v. Holland-Moritz*, supra.

though appellant visited with the children after appellee had taken them and asserted himself permanent custodian, she did not attempt to regain custody by refusing to return them to appellee. Instead, she sought to regain her children by the use of a writ of habeas corpus, the avenue appellee should have pursued if he believed either that appellant would take the children to another jurisdiction or that he was better suited than appellant to be their custodian.

When a party, in bad faith, removes a child from another jurisdiction in order to circumvent an adverse custody order of a court in that jurisdiction, our courts have held that such evasion of the law, if proven, should be an important factor when Pennsylvania courts consider the custody dispute. *Commonwealth ex rel. Rogers v. Daven*, 298 Pa. 416, 148 A. 524 (1930); *Irizarry Appeal*, 195 Pa.Super. 104, 169 A.2d 307 (1961). The instant case raises the same troublesome issue. In resorting to self-help remedies, appellee acted in a manner inconsistent with the orderly and impartial resolution of disputes concerning the custody of minors. In ascertaining who would best serve the welfare of the children, the lower court should consider appellee's disrespect for the legal process and evaluate how it bears on his fitness to be awarded custody of the children. *Commonwealth ex rel. Daven v. Smith*, supra; *Irizarry Appeal*, supra.

Accordingly, we vacate the order of the lower court and remand for an evidentiary hearing at which the lower court should determine which parent is, presently better capable of promoting the best interests and welfare of the children. It should also consider appellee's conduct as one of the factors relevant to this determination.

Order vacated and case remanded for proceedings consistent with this opinion.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

JACOBS, President Judge, and CERCONE, J., concur in the result.

PRICE, J., dissents.