444 A.2d 1299

**COMMONWEALTH of Pennsylvania ex rel. Mary Ann GORTO**

v.

**Andrew GORTO and Stella Gorto, Appellants.**

Superior Court of Pennsylvania.

Argued Feb. 17, 1982.

Filed April 30, 1982.

510

Frank Townend, Wilkes-Barre, for appellants.

Janet A. Conser, Wilkes-Barre, for appellee.

Before JOHNSON, MONTEMURO and MONTGOMERY, JJ.

MONTEMURO, Judge:

The instant matter presents a custody contention in which the mother of a child has sought to regain her daughter from the parents of her second husband, former stepfather to this child.

The child was the offspring of an early first marriage which was annulled prior to the child's birth. When the mother remarried, she left the child with her own mother

for about three months, after which the child joined the mother and stepfather and step-grandparents in a single household.

The new husband became increasingly violent, at one point threatening to kill his wife and stepchild with a shotgun. After about eighteen months, the older couple requested that the younger couple move out to their own apartment, which they did. The child remained with her step-grandparents, which was certainly a safer place for her in view of the violent abuse of the wife that ensued. Within months, the wife separated from her second husband.

The mother was unwelcome at her in-law's house unless she pretended to be trying to reconcile with their son. She was told that she no longer had legal custody of her child, but she persisted in visiting and calling and sending gifts. Eventually she went to the Luzerne County United Services Agency to find out how to regain her child. She was referred to Legal Services and thereafter filed a Petition for *Habeas Corpus.*

The step-grandparents appealed the decision to return this child to her natural mother on the following grounds: (1) that the best interests of the child lay in her custody with them; (2) the mother is mentally, morally, and psychologically unfit for custody; (3) the record is imperfect because psychiatric records submitted to the court were afterwards "blanked-out."

Upon review, we find the opinion of the court below to be thorough and well-reasoned, and we affirm.

■ The parties are correct that the best interests of the child must be paramount. We find that the lower court correctly applied that measure to the facts of the instant case, stating that "although the question to be decided is what is in the child's best interest, the parties do not start out even because the parents have a *prima facie* right to custody." The lower court then cited *In Re Custody of Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977), to the following effect:

Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side. Id., 249 Pa.Superior Ct. at 286, 376 A.2d at 654.

■ The step-grandparents therefore had a heavy burden of proof to obtain custody, and they did not meet that burden. They have indeed provided a loving home for the child, who is a friendly, attractive little girl. However, no abandonment of this child by her natural parent was proved. The son of the step-grandparents, the then-husband of the mother, was a dangerously violent man. The decision to leave the child in the safer atmosphere of the home where the step-grandparents resided was a reasonable one at the time the young couple moved out. Despite discouragement by the step-grandparents, the mother persisted in maintaining loving contact with her child and she eventually found legal assistance. She never abandoned her child.

■ The claim that the mother is unfit for custody rests on three grounds: she participated in a theft with her husband, their son; she has another daughter born out of wedlock; she has a past history of psychiatric problems.

As to the theft charge, the mother has successfully completed her probation, has no other record, and is no longer associating with her co-defendant—former husband. We note that he is frequently living in his parents' home and remains a violent person.

As to the presence of the half-sister, the liaison that produced the infant was long-term and apparently not traumatic to the older child, who obviously loves the baby. The fact that the mother is successfully raising a happy, healthy infant speaks for her competence in child-raising at this period in her life. A surprise visit by a social worker shortly before trial date found her two-bedroom apartment clean

and neat and nicely furnished, located near an elementary school. We agree with the lower court that the surroundings in the maternal home are adequate and that the nonmarital birth of the younger sister is not a detriment to the older child's development.

The most serious problem the lower court faced was the psychiatric history of the mother, who has been institutionalized occasionally and has had ongoing outpatient treatment in recent years. She was examined in connection with this case at the request of the court below in November of 1979.

This latest report states that her emotional state is now "stabilized" and her previous impulsiveness is generally well-controlled. She has taken no psychotropic medication for eight years. She was cooperative at her interview, and coherent and logical, although overtalkative. Because of her past history of psychiatric disturbances, the report found prognosis for the future "guarded."

It is obvious from this court-ordered report as well as from testimony of other witnesses that the mother's adolescent and early adult years were subject to stresses which were in large part not within her control. At present she has organized her own life, established her own pleasant apartment independent of her troubled girlhood home and her violent former spouse. She has persisted against discouraging odds in her determination to regain custody of her child. She has continued her monthly psychiatric check-up visits, which now amount to discussing anything upsetting to her, mostly her anxiety about this action. She babysits regularly for a neighbor, who enthusiastically endorses her nurturing abilities.

The child herself was interviewed by the court and showed real attachment to her mother and baby sister. She loved her step-grandparents too, but her fears in leaving their home amounted to being concerned about losing her neighborhood friends.

■ The primary concern in custody matters lies not with the past but with the present and future. *Hooks v. Ellerbe*, 257 Pa.Super. 219, 390 A.2d 791 (1978), reversed on other grounds 490 Pa. 363, 416 A.2d 512 (1980). Facts *as of time of hearing* are the foundation for determination of the court. *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974). Past conduct is not relevant unless it will produce an ongoing negative effect on the child's welfare. *In Re Leskovich*, 253 Pa.Super. 349, 385 A.2d 373 (1978).

The mother in this case had some difficult periods in her life but has never abandoned her child. The step-grandparents have provided a loving home during some stressful times, but that could not give them custody by default. The mother can now provide a stable environment; she has sought and continues to rely upon community-offered help, both medical and legal, for her problems; she is successfully keeping a clean and comfortable home and raising a healthy, happy younger child. The lower court was well within its discretion in awarding custody to the mother.

■ The final question concerns the possibility that some of the medical records of the mother were "blanked out" between one hearing and another. Whether the records were in fact tampered with is not clear on the present record. However, the case of *In Re B.*, 482 Pa. 471, 394 A.2d 419 (1978) makes the production of any such records moot, and we will not remand the case for augmentation of a record with material which violates the mother's constitutional right to privacy.

In *In Re B., supra*, the lower court had demanded revelation of the psychiatric records of the mother of a delinquent child to help determine proper custody.

The Supreme Court held that the constitutional right to privacy forbade wholesale exposure of private records of the custodial mother. As the court pointed out, persons seeking psychiatric help are expected to "lay bare" their "entire self" to the therapist and may admit to embarrassing or shameful thoughts to obtain healing results. Such revela-

tions deserve confidentiality. The practical application made by that court seems relevant to the instant facts as well:

The record in the instant case reveals that the patient's hospital records were subpoenaed so that they could be evaluated by the juvenile court judge, the court's staff psychologist, staff psychiatrist, and staff social workers, so that they might assist the court in determining who should have custody over the patient's delinquent son. More specifically, according to the record of the hearing held pursuant to the subpoena of the hospital records regarding Mrs. B, these records were sought so that the juvenile court could decide whether or not to allow Mrs. "B's" delinquent son to return home to live with her. The court, based on the recommendation of its staff psychologist, felt that much of the juvenile's psychiatric history could be explained by the mother's history. We applaud the court's concern about proper placement for a juvenile; the court's efforts to place the child with one of his parents are commendable.

We recognize that our holding may, in some cases, make it more difficult for the court to obtain all the information it might desire regarding members of the juvenile's family, or about the juvenile's friends, neighbors, and associates. The individual's right of privacy, however, must prevail in this situation. Moreover, much, if not all, of the information sought by the juvenile court might have been obtained without ordering disclosure of materials revealed within the private confines of the mother's constitutionally protected doctor-patient relationship. The mother might have voluntarily submitted to psychiatric examination by a court-appointed psychiatric expert who could evaluate her ability to provide a proper home for her child, or who could, based on the findings of such examination, recommend appropriate alternative placement. Neither the doctor-patient privilege created by statute, nor the constitutionally protected zone of privacy would bar such an evaluation because the mother would not be relying detri-

mentally on either the doctor-patient privilege or upon her right of privacy if she chose to submit to such an evaluation. *Cf. Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In this way, the juvenile court could accommodate its legitimate interest in assuring proper placement of the juvenile while at the same time preserving other important social interests. *Id.* 394 A.2d at 426.

In the instant case we note that the court did order an updated psychiatric examination of the mother, with which she willingly complied, and the trial judge gave greater weight to the results of that recent evaluation than to any of the reports from a prior period, a proper disposition of the matter. The mother's readiness to seek help should not be used to her prejudice, and we are in accord with the decision in *In Re B* that delving into the private records of a custodial parent's psychiatric history is an impermissible invasion of privacy. Thus, the lack of certain pages of record, if true, is immaterial to the outcome of this case, and affords no reason for remand.

Accordingly, we affirm the order of the court below.