436 S.E.2d 299

**Gretchen Smith SNYDER and Daniel John Smith, an Infant, Petitioners Below, Appellants,**

v.

**Paul E. SCHEERER and Nancy H. Scheerer, Respondents Below, Appellees.**

**No. 21223.**

Supreme Court of Appeals of West Virginia.

Submitted March 9, 1993.

Decided July 16, 1993.

Mike Kelly, Charleston, for appellants.

Homer A. Speaker, Martinsburg, for appellees.

PER CURIAM:

The Appellant, Gretchen Smith Snyder, appeals from a December 6, 1991, order of the Circuit Court of Jefferson County denying her petition for habeas corpus to regain custody of her son, Daniel John Smith. The Appellant contends that the lower court erred in concluding that she was medically unfit and in allowing custody to remain with the Appellant's sister, Nancy H. Scheerer, and her husband Paul E. Scheerer. We agree and reverse the decision of the lower court.

I.

The Appellant, presently age forty-three, has suffered repeated episodes of mental illness throughout the past twenty years. In 1979, her condition was diagnosed as bi-polar disorder, commonly known as manic-depressive disorder. This disorder was treated with therapy and closely monitored lithium medication. The Appellant discontinued her use of lithium in 1983, however, due to weight gain associated with the drug. Upon discontinuation of the drug, the Appellant became ill and was hospitalized.

The Appellant also smoked marijuana at times during the course of her illness, diminishing the effectiveness of the lithium treatments. She contends, however, that she has not used marijuana or other illegal drugs since August 1987. The Appellant again discontinued her lithium treatment in 1987 in order to attempt to have a child. A substitute medication was prescribed but was ineffective. The Appellant became pregnant in December 1987 while residing in a board and care facility as a ward of a Butte County, California court. The Appellant contends

that she is uncertain as to the identity of the father.

While pregnant, the Appellant began to fear that the State of California would remove her child from her custody after the child was born. Thus, she contacted her mother and discussed plans to reside at her mother's home in Wisconsin. During the pregnancy, however, the Appellant's mother died, and the Appellant thereafter resided in Shepherdstown, West Virginia, with Appellees Nancy and Paul Scheerer. The Appellant began residing with them on May 31, 1988, during her fifth month of pregnancy. She delivered her son, Daniel John Smith, at Jefferson Memorial Hospital in Charles Town, West Virginia, on September 10, 1988.

Based upon her desire to breast-feed her son, the Appellant continued to abstain from her lithium medication after the child's birth. She subsequently suffered another episode of mental illness in November 1988 and was hospitalized in Winchester Medical Center, Winchester, Virginia, for approximately twenty days. On January 4, 1989, the Appellant attempted suicide and was hospitalized again until March 2, 1989. Upon her release, she signed a custody agreement granting temporary custody of Daniel to the Appellees. Although a permanent custody arrangement was discussed and the Appellees' attorney drafted such a permanent agreement, the Appellant agreed only to temporary custody. She contends that she recognized the limitations of her ability to care for her infant during the pendency of her struggle with mental illness and desired only a temporary custody arrangement with her sister. Specifically, the agreement provided that the Appellant was "unable to care for said Daniel John Smith, an infant, because she has been recently hospitalized and a period of recuperation will be required before she can properly care for her son...." The Appellees were given "temporary custody of the said Daniel John Smith ..." and the Appellant was given visitation for four hours every week. Further, the Appellant was not required to provide any monetary support for Daniel, and the agreement could "be changed or modified by the parties or by an Order of a court of competent jurisdiction upon a showing that the best interests of said Daniel John Smith would be served by a change or modification of the terms hereof."

Upon the Appellant's March 2, 1989, release from the hospital, the Appellees informed her that she could not continue to reside in their home. The Appellant thereafter resided in Winchester, Virginia, in order to obtain work, allowing her son to remain in the custody of her sister. In June 1989, the Appellant obtained employment as a certified nursing assistant at a nursing care facility. She began her initial attempts to regain custody of Daniel in September 1989, approximately six months after the temporary custody agreement had been signed and when Daniel was approximately one year of age. The Appellees were uncooperative with the Appellant's attempts to gradually transfer custody back to her. When the Appellant realized that her informal attempts seemed fruitless, she retained an attorney to contact the Appellees regarding a plan for a gradual transition of custody. On September 28, 1989, the attorney wrote to the Appellees and proposed expanded visitation affording a gradual transition of custody back to the Appellant. The Appellees, responding through their own attorney, indicated that they were not interested in negotiating additional visitation. The restricted visitation provided in the temporary custody agreement continued for an additional year. During this period, the Appellant suffered two orthopedic injuries unrelated to her mental condition. After recovering, the Appellant filed a petition for a writ of habeas corpus with the Circuit Court of Jefferson County on August 31, 1990, requesting custody of Daniel. On October 29, 1990, the lower court denied the Appellant's motion, but expanded her visitation rights to include overnight and weekend visits. Visitation was further expanded in subsequent orders entered June 5, 1991, and August 8, 1991.

The Appellant enrolled in community college courses and was accepted by the Shen-

andoah University School of Nursing for the fall 1991 term. She has continued her lithium therapy and has not suffered a recurrence of her condition since her release from hospitalization on March 2, 1989. Her treating psychiatrist, Dr. A. C. Kiczales, testified that her prognosis is excellent and that she is fully capable of caring for Daniel, meeting his daily needs, providing adequate supervision, and handling the stress associated with coping with a child of his age. Dr. Kiczales also testified that the Appellant is motivated to continue taking her medication and is no longer a suicide risk.

The Appellant currently resides with Mr. Jim Butler in Cross Junction, Virginia. Although the Appellant and Mr. Butler apparently have no present plans for marriage, they testified regarding their devotion to one another and to Daniel and regarding the possibility of marriage in the future. Mr. Butler has been a high school teacher for approximately twenty years and is presently teaching marketing and management supervision at Warren County High School in Front Royal, Virginia. He has two children, ages twenty and twenty-four, from a previous marriage.

The Appellees were married in 1954, divorced in February 1970, and remarried in August 1970. Mrs. Scheerer is fifty-eight years of age, and Mr. Scheerer is fifty-nine years of age. Mr. Scheerer has been employed as Vice President of Operations by Martin–Marietta Magnesia Specialties in Baltimore, Maryland, for twenty-seven years. The Appellees have three grown children who no longer live at home. Mr. Scheerer has placed Daniel on his health insurance policy and has established a savings account in Daniel's name in which the Scheerers have placed $10,000 in various bonds which were the proceeds of social security benefits received by Daniel as a result of his mother's disability.

Psychologist Bradley Soule testified on behalf of the Appellees. He concluded that Daniel should remain in the custody of the Appellees because they have provided a stable environment, Daniel regards them as his parents, and the nature of the Appellant's disease raises serious concerns regarding her future well-being. Marcie Kemner, a legal assistant with the Department of Health and Human Resources and an employee of the Tri–County Pastoral Counselling Center, testified regarding the bond between Daniel and the Scheerers. Ms. Kemner, hired by the Appellees to assess Daniel's situation, related difficulties with Daniel's behavior subsequent to visitation with the Appellant. Ms. Kemner visited the Appellees' home on two occasions, observed Daniel's interaction with the Appellees, and concluded that the Appellees provided Daniel with a stable environment.

The only negative information presented with regard to the Appellees consisted of the instability of the marriage in the late 1960's and early 1970's and Mrs. Scheerer's alleged excessive alcohol consumption. Mrs. Scheerer contends that although she and her husband drink regularly, neither consumes alcohol in amounts which would in any manner endanger Daniel or affect their relationship with him.[1]

The lower court found that the Appellees were the psychological parents of the child and that the "real issue" was the Appellant's lack of medical fitness to regain custody.

---

1. The Appellant testified that Mrs. Scheerer's driving abilities were sometimes impaired due to her consumption of alcohol. Mary Francis Hockman, a personal friend of the Appellees, testified that she was present during the driving incident the Appellant specifically referenced. Mrs. Hockman indicated that she had never witnessed anything which caused her concern about the drinking habits of Mrs. Scheerer and that the particular driving incident was unrelated to alcohol consumption. Mrs. Hockman also testified that she had witnessed the Appellant french-kissing Daniel when he was five or six weeks of age. Although these issues were not discussed extensively in the briefs of the parties, the lower court did address the issue of Mrs. Scheerer's alcohol consumption in its final order, as follows:

There is evidence suggesting that Ms. Scheerer may be more than just a social drinker and that the Respondents' domestic life has not always been stable. However, it appears to this Court that such evidence is of aberrations in what appears overall to be a long-term stable relationship, both from a nurturing standpoint and a financial standpoint.

Although the court found that the Appellant would make an excellent parent when healthy, the court concluded that her mental disorder was insidious and characterized by repeated relapses. The court therefore determined that custody of Daniel should remain with the Appellees with reasonable visitation rights to the Appellant, to be mutually agreed upon by the parties.

## II.

■ The Appellant contends that the lower court abused its discretion by finding her medically unfit to gain custody of her son and by applying the psychological parent test. In adjudging parental fitness, we held the following in the syllabus of *Ford v. Ford,* 172 W.Va. 25, 303 S.E.2d 253 (1983):

> " 'A parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her child will be recognized and enforced by the courts.' Syl. pt. 2, *Hammack v. Wise,* 158 W.Va. 343, 211 S.E.2d 118 (1975); Syllabus, *State ex rel. Kiger v. Hancock,* 153 W.Va. 404, 168 S.E.2d 798 (1969); Syllabus, *Whiteman v. Robinson,* 145 W.Va. 685, 116 S.E.2d 691 (1960)." Syl. pt. 1, *Leach v. Bright,* 165 W.Va. 636, 270 S.E.2d 793 (1980).

While we are mindful of the natural parent's right to custody of his own child absent compelling circumstances necessitating a contrary result, we must also be cognizant of the fact that the right of a natural parent must not be examined in a vacuum; it must be tempered by the rights of the child and balanced against those rights in some fashion. As we recognized in syllabus point 1 of *Davis v. Hadox,* 145 W.Va. 233, 114 S.E.2d 468 (1960):

> 'When a parent, by agreement or otherwise, has transferred, relinquished or surrendered the custody of his or her child to a third person and subsequently demands the return of the child, the action of the court in determining whether the custody of the child shall remain in such third person or whether the child shall be returned to its parent depends upon which course will promote the welfare and the best interests of the child; and the parent will not be permitted to reclaim the custody of the child unless the parent shows that such change of custody will materially promote the moral and physical welfare of the child.' Point 4 Syllabus, *State ex rel. Harmon v. Utterback,* [144] W.Va. [419], [108 S.E.2d 521] [ (1959) ].

■ More recently, in *In re Brandon L.E.,* 183 W.Va. 113, 394 S.E.2d 515 (1990), we explained the following at syllabus point 4:

> If a child has resided with an individual other than a parent for a significant period of time such that the non-parent with whom the child resides serves as the child's psychological parent, *during a period when the natural parent had the right to maintain continuing substantial contact with the child and failed to do so,* the equitable rights of the child must be considered in connection with any decision that would alter the child's custody. To protect the equitable rights of the child in this situation, the child's environment should not be disturbed without a clear showing of significant benefit to him, notwithstanding the parent's assertion of a legal right to the child. (emphasis added)

(emphasis added). These concerns are indicative of our continuing emphasis on the best interests of the child as a guiding force in all custody matters, as well as a recognition that the child has his own individual rights. We have consistently held that the "child's welfare is the paramount and controlling factor in all custody matters." *David M. v. Margaret M.,* 182 W.Va. 57, 60, 385 S.E.2d 912, 916 (1989). "[A]ll parental rights in child custody matters are subordinate to the interests of the innocent child." *Id.*

■ The best interests and welfare of the child are indeed the "polar star" by which the discretion of the court will be guided in custody matters. *Utterback,* 144 W.Va. at 428, 108 S.E.2d at 527. Yet, as we recognized in *Hammack,* the " 'polar star' concept will not be invoked to deprive an unoffending parent of his natural right to the custody of his child." 158 W.Va. at 347, 211 S.E.2d at 121. We also explained that "[t]he right of a parent to have the custody of his or her child is founded on natural law and, while not absolute, such right will not be taken away unless the parent has committed an act or is guilty of an omission which proves his or her unfitness." *Id.,* at 348, 211 S.E.2d at 121.

■ In *McCartney v. Coberly,* —— W.Va. ——, 250 S.E.2d 777 (1978), a mother had attempted to regain custody of her daughter from individuals with whom she had entered into a written custody agreement. *Id.,* at ——, 250 S.E.2d at 778. The lower court had concluded that she was not entitled to regain custody because she had not shown that a change in custody would benefit the child. *Id.* We determined that the written agreement was only temporary in nature. In addressing the issue of the nonoffending parent in syllabus point 1, we held that "[t]he granting of temporary custody of a child by its natural parent to a third person is not tantamount to a divestiture of the right of the parent to custody of the child." *Id.,* at ——, 250 S.E.2d at 777. Further, we explained that "[w]hen a parent transfers temporary custody of a child to a third person, the parent may reclaim custody without showing that the change of custody will materially promote the moral and physical welfare of the child." *Id.,* at ——–——, 250 S.E.2d at 777–78, Syl. Pt. 2.

In *Whiteman,* we encountered a situation in which a father, confronted with a family emergency, granted temporary custody of his child to a third party until he could provide a suitable home for the child. 145 W.Va. at 687, 116 S.E.2d at 693. We acknowledged the general principle that a parent, subsequent to relinquishing custody, may not regain custody of his child without a showing that a change in custody would promote the moral and physical welfare of the child. *Id.,* at 691, 116 S.E.2d at 695. Under such circumstances of an unoffending parent, however, we found that the principle which precludes a parent from regaining custody without such a showing does not apply. *Id.,* at 692–93, 116 S.E.2d at 695.

We encountered another unoffending parent in *Honaker v. Burnside,* 182 W.Va. 448, 388 S.E.2d 322 (1989). In that case, we reiterated that the concept of best interests of the child " 'will not be invoked to deprive an unoffending parent of his natural right to the custody of his child.' " *Id.* at 451, 388 S.E.2d at 324 (quoting *Hammack,* 158 W.Va. at 347, 211 S.E.2d at 121). In *Honaker,* a natural father sought to regain custody of his six-year-old daughter after her mother's death. The child's step-father, with whom the child had resided for over three years, objected, claimed that it was in the child's best interests to remain with him, and offered evidence that he was the child's psychological parent. In that case, as in the present case, it was undisputed that the child had a close, loving relationship with the step-father and a stability of surroundings with a younger half-brother in her step-father's home. Nonetheless, we held that the strong bond between the child and her step-family "cannot alter the otherwise secure natural rights of a parent." *Id.,* at 452, 388 S.E.2d at 325. Absent a showing of unfitness or abandonment, denial of the natural father's right to custody " 'would permit any person who obtains possession of a child and forms an attachment for it to take and keep permanently the child of any worthy parent....' " *Id.,* at 451, 388 S.E.2d at 325 (quoting *Whiteman,* 145 W.Va. at 696, 116 S.E.2d at 697).

A review of our methodology for determining custody in situations similar to the present case reveals our emphasis upon the nature of parental conduct in relinquishing custody or abandoning the child. In *In re Custody of Cottrill,* 176 W.Va. 529, 531, 346 S.E.2d 47, 50 (1986), for instance, we hinged

our decision to a significant degree upon the fact that the mother "implicitly surrendered custody" of her child to the child's grandparents. We determined that the best interests of the child would be served by awarding custody of the child to the grandparents rather than to the mother. *Id.*, at 532, 346 S.E.2d at 51. The mother's relinquishment of custody was not forced by any compelling circumstances such as the Appellant's mental illness in the present case. Furthermore, she made no attempt to regain custody until several years had passed and maintained no regular contact with the child during those years. *Id.*, at 531, 346 S.E.2d at 50.

By contrast, the Appellant in the present case entered the initial custody agreement in order to provide the child with a stable environment until she was able to take care of him herself. Within six months after the temporary placement, she began her initial steps to regain custody. Throughout the entire time, she maintained as much contact with her son as the custody arrangement permitted. Pursuant to that arrangement, the Appellant was able to visit her son for four hours every week. Mrs. Scheerer testified that the Appellant exercised those visitation rights approximately eighty percent of the time and was unable to visit Daniel for only a brief period of time due to an automobile accident and the resulting injuries. Overall, however, the Appellant maintained regular contact with her son during their separation.

### III.

The Appellant contends that the Appellees have essentially conceded that she is not unfit based upon her medical condition and the speculative nature of its possible recurrence. The Appellees, while not devoting substantial effort arguing the unfitness claim, have not formally conceded that point. The lower court explained that the unfitness claim was the "real issue" of this case and based its decision, at least to some extent, on that issue.

The lower court's investigation into the Appellant's history of mental illness and the effect it could potentially have on Daniel was well-justified. However, after such investigation into the details of the illness and extensive testimony by her treating physician, the lower court found the Appellant to be "currently well," found that she was "making a gallant effort to deal with this illness," and held that she was an "intelligent, caring and responsible individual." Further, the lower court found that if healthy, the Appellant would be "an excellent parent." No presently existing evidence of mental incapacity was established, and no presently existing detrimental effects of the illness on the Appellant's parenting skills were identified.[2]

Dr. Soule, having never examined the Appellant, consulted with the Appellees for only ninety minutes and admitted to being "without present knowledge of Gretchen Snyder's state of mind." Based upon his interviews of the Appellees and Daniel, Dr. Soule testified that he felt that it was in the best interest of Daniel to remain with the Appellees. He further explained that the Appellees and Daniel seemed to engage in attachment and bonding behaviors and appeared comfortable with one another.

■ Dr. Kiczales, the Appellant's treating psychiatrist since November 1988, testified that the Appellant had been "remarkably stable" since her discharge and had been "very faithful about taking" her medication. Dr. Kiczales also explained that the Appellant's prognosis was excellent and that if she suffered a relapse, "[i]t's not a switch thing where you go to bed well and wake up sick." In Dr. Kiczales' opinion, although the Appellant might not realize she was having a relapse, there would be sufficient opportunity for her employer, co-workers, friends, and family to intervene in the event of a relapse.

We have had the opportunity to address the impact of a parent's mental illness upon a

---

2. The Appellant recognizes the legitimate concern for Daniel's safety and contends that such concern could properly have been addressed by granting visitation to the Appellees, assuring continued observation of the Appellant's mental state. Other suggestions by the Appellant include monthly blood analysis and therapy. The Appellant has indicated her willingness to participate in a variety of procedures designed to monitor her mental well-being.

custody decision in a variety of contexts. In *State v. Scritchfield*, 167 W.Va. 683, 280 S.E.2d 315 (1981), for instance, we rejected the use of a history of hospitalization for mental illness as *per se* grounds for termination of parental rights. *Id.*, at 691, 280 S.E.2d at 320. More recently, we upheld a termination of parental rights in *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991), upon evidence that the mother was presently suffering violent mood swings and had "demonstrated her unwillingness to seek treatment or therapy for her condition." 185 W.Va. at 630, 408 S.E.2d at 382.

While *Scritchfield* and *Carlita B.* involved termination of parental rights, they are illustrative of our approach to the effect of the issue mental illness on custody decisions. The Appellant has also directed our attention to cases from various other jurisdictions wherein speculation regarding future mental problems was not permitted to form the basis for a decision to deny custody to a parent. In *Meyer v. Meyer*, 375 N.W.2d 820 (Minn. Ct.App.1985), for instance, a mother's history of schizophrenia was found *insufficient to* justify an award of custody to the father. As in the present case, the mother in *Meyer* required prolonged treatment and medication to maintain a stable mental condition. *Id.*, at 823. In *Committee ex rel. Gorto v. Gorto*, 298 Pa.Super. 509, 444 A.2d 1299 (1982), the court held that the facts as they existed at the time of the hearing were to be the foundation for the decision. 298 Pa.Super. at 513, 444 A.2d at 1301 (citing *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974)). The *Gorto* court explained that "[p]ast conduct is not relevant unless it will produce an ongoing negative effect on the child's welfare." *Id.* (citing *In re Leskovich*, 253 Pa.Super. 349, 385 A.2d 373 (1978)).

As we held in syllabus point 1 of *In re Adoption of Schoffstall*, 179 W.Va. 350, 368 S.E.2d 720 (1988), " 'the standard of proof required to support a court order limiting or terminating parental rights to custody of minor children is clear, cogent and convincing proof.' Syllabus Pt. 6, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973)." We also explained in *Rowsey v. Rowsey*, 174 W.Va. 692, 695, 329 S.E.2d 57, 61 (1985), that "[a]

change of custody based on a speculative notion of potential harm is an impermissible exercise of discretion." After thorough review of the testimony of the two physicians rendering opinions in this case, we find little support for the lower court's conclusion that the potential for future harm justifies the denial of custody to the Appellant. Such a conclusion, while laudable in its obvious intent to protect the innocent child, infringes too profoundly upon the rights of this natural parent to her child and is based upon mere speculation as to the future course of the Appellant's disorder. The evidence is insufficient to prove the medical unfitness of the Appellant.

Accordingly, we reverse the decision of the Circuit Court of Jefferson County and remand this case with directions that the custody of Daniel be awarded to the Appellant and with further directions that the Appellees be awarded extensive and meaningful visitation rights. We have recognized the right of a child to continued association with those individuals to whom the child has formed an attachment. Clearly, such an attachment exists between Daniel and the Scheerers, and they have been too important in Daniel's life for him to be deprived of a continued relationship with them. Furthermore, we have recognized the following in syllabus point 3 of *In re James M.*, 185 W.Va. 648, 408 S.E.2d 400 (1991):

It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

Upon remand, the lower court should endeavor to fashion a plan of gradual transition of custody designed to minimize disturbance of Daniel's life. As we recognized in *Honaker v. Burnside*, 182 W.Va. 448, 452, 388 S.E.2d 322, 326 (1989), stability in a child's

life is a major concern when formulating custody arrangements.

The *Honaker* case involved a custody dispute (after the death of the mother) between a natural father and a step-father with whom the child had formed a close bond. In directing the circuit judge to develop a plan of gradual transition in that case, this Court stated

No matter how artfully or deliberately the trial court judge draws the plan for these coming months, however, its success and indeed the chances for ... [the child's] future happiness and emotional security will rely heavily on the efforts of these two fathers. The work that lies ahead for both of them is not without inconvenience and sacrifice on both sides. Their energies should not be directed even partially at any continued rancor at one another, but must be fully directed at developing compassion and understanding for one another, as well as showing love and sensitivity to the children's feelings at a difficult time in all their lives.

*Id.*

The mission for these mothers is the same.

Reversed and remanded.

NEELY, J., dissents.