J-S13029-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| C.S. | ⁞ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | ⁞ | |
| v. | ⁞ | |
| T.S. | ⁞ | |
| Appellant | ⁞ | No. 1700 WDA 2014 |

Appeal from the Order September 16, 2014
In the Court of Common Pleas of Blair County
Civil Division at No(s): 2007 GN 6039

BEFORE:  BENDER, P.J.E., MUNDY, J., and STABILE, J.

MEMORANDUM BY MUNDY, J.:                     **FILED MAY 15, 2015**

Appellant, T.S. (Mother), appeals from the September 16, 2014 custody order that denied her request to modify the existing custody order, entered January 26, 2011, with respect to her daughter, A.S., born in November 2000, and her son, J.S., born in February 2006 (collectively, the Children).  After careful review, we affirm.[1]

Following an evidentiary hearing in December of 2010, the trial court entered the January 26, 2011 existing custody order granting C.S. (Father) sole legal and primary physical custody and Mother partial physical custody on alternating weekends.  In addition, the existing custody order granted

_____

[1] The Honorable Hiram A. Carpenter, III, presided over the proceedings that resulted in the subject custody order as well as in the existing custody order.

Mother physical custody every Wednesday during the school year from 3:30 p.m. to 7:00 p.m. and, during the summer, from 9:00 a.m. to 8:00 p.m.

On August 27, 2013, Mother filed a petition to modify the existing custody order, wherein she sought primary physical custody of the Children. The evidentiary hearing in this matter occurred on August 26, 2014, during which Mother and Father testified. By opinion and order dated September 15, 2014, and entered on September 16, 2014, the trial court denied Mother's request for modification. Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).[2]

On appeal, Mother presents the following issues for our review.

> I. Whether the trial court erred and/or abused its discretion in failing to place primary physical custody of the subject children in [] Mother under the law and the facts and the circumstances of this case[?]
>
> II. Whether the trial court erred and/or abused its discretion in its application of the custody factors to the facts and circumstances of this case in deciding not to place primary physical custody of the subject children in [] Mother[?]
>
> III. Whether the trial court erred and/or abused its discretion in failing to significantly expand the amount of time that the [ ] Mother has physical custody of the subject children in view of her availability and clear capability of caring for them

_____

[2] On November 10, 2014, the trial court filed a notice of its intent to rely on the certified record and its previous opinions for purposes of Mother's appeal.

and meeting their needs during the times when [] Father is unavailable[?]

Mother's Brief at 4.

The scope and standard of review in custody matters is as follows.

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it…. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination…. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.
>
> *R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (*quoting* *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)).  Moreover,
>
> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

- 3 -

> *R.M.G., Jr.*, *supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (parallel citations omitted).

Further, we have stated the following.

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006), *quoting Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006), *quoting Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004).

The Child Custody Act (the Act), 23 Pa.C.S.A. §§ 5321-5340, became effective on January 24, 2011. Because the proceedings in the instant case occurred after the effective date of the Act, the Act is applicable. *See C.R.F. v. S.E.F.*, 45 A.3d 441, 442 (Pa. Super. 2012) (concluding that "where the

evidentiary proceeding commences on or after the effective date of the Act, the provisions of the Act apply even if the request or petition was filed prior to the effective date[]").

Relevant to this custody case are the factors set forth in Section 5328(a) of the Act, which provides as follows.

> **§ 5328. Factors to consider when awarding custody.**
>
> **(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> >
> > (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
> >
> > (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).
> >
> > (3) The parental duties performed by each party on behalf of the child.
> >
> > (4) The need for stability and continuity in the child's education, family life and community life.
> >
> > (5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

> (16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[3]

This Court has stated that, "[**a**]**ll** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." ***J.R.M. v. J.E.A.***, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).

> Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328 custody] factors prior to the deadline by which a litigant must file a notice of appeal." ***C.B. v. J.B.***, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013)….
>
> In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." ***M.J.M. v. M.L.G.***, 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, 68 A.3d 909 (Pa. 2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). ***Id.***

***A.V.***, ***supra*** at 822-823. With these standards in mind, we turn to the merits of this appeal.

---

[3] The Act was amended, effective January 1, 2014, to include the additional factor at Section 5328(a)(2.1).

All three of Mother's issues pertain to the trial court's discretion in applying the custody factors under the Act to the facts of this case. Specifically, Mother argues "there is no sound basis for not placing primary physical custody of the children with her, together with substantial periods of partial custody with Father consistent with his work schedule[.]" Mother's Brief at 11. Mother argues the current custody arrangement "results in significant periods of time during which the [C]hildren are cared for by babysitters and others." *Id.* Further, Mother asserts that "although Mother's behavior may be unusual, inconvenient, uncomfortable, or somewhat disruptive; this should not be grounds for denying her request for primary physical custody of [the C]hildren unless the conduct can be specifically shown as having a detrimental impact on the [C]hildren," which Mother asserts it does not. *Id.* at 12-13.

In its September 16, 2014 opinion and order, the trial court fully addressed all of the Section 5328(a) custody factors in light of the evidence presented during the hearing on August 26, 2014. Trial Court Opinion, 9/16/14, at 6-20. In addition, the trial court incorporated its opinion dated January 26, 2011, with respect to the existing custody order. Specifically, the trial court explained its rationale as follows.

> [B]ased on the record created at the present hearing that Opinion remains extremely accurate as to the issues in the case and, given this opportunity, we would not change a single word of our earlier writing (notwithstanding the passage of almost four years) as accurately reflecting the situation both as it

existed then and as it exists now. In fact, most of []
Mother's presentation involved a repeat of what we
heard at that time.

*Id.* at 5-6. In the January 26, 2011 opinion, the trial court stated that, "[a]t the outset, we acknowledge that [M]other's mental health condition and her resultant behaviors are key issues in this case…. They affect both her thought process and her judgment." Trial Court Opinion, 1/26/11, at 5.

In the instant matter, Mother's mental health condition was undisputed. In her brief, Mother states she suffers from "certain disabilities resulting from an accident when she was a teenager…." Mother's Brief at 10. Further, at the custody hearing, Mother testified she had a traumatic head injury and acknowledged that she suffers from short-term memory loss. N.T., 8/26/14, at 68, 101. Mother also testified she suffers from Attention Deficit Hyperactive Disorder (ADHD), for which she is prescribed Adderall, and she suffers from Post-Traumatic Stress Disorder (PTSD). N.T., 8/26/14, at 68. Finally, Mother testified she is under the care of a psychiatrist whom she sees on a monthly basis. *Id.*

With respect to Mother's mental health, the trial court noted that ADHD and PTSD "were not established as the diagnosis in [Mother's] medical records[.] [However,] the impulsive behavior, acting without regard to consequences, and disorganized thinking on the part of the Mother which are documented in the mental health records were on full display both through

[] Mother's testimony and reviewing her actions where the [C]hildren are concerned." Trial Court Opinion, 9/16/14, at 17.

In considering all of the Section 5328(a) custody factors, the trial court found that the most relevant ones weighed in favor of Father.[4] Significantly, with respect to Section 5328(a)(4), the need for stability and continuity in the Children's education, family life and community life, the trial court found that Mother's mental health difficulties "impact dramatically the stability and continuity which she could offer the [C]hildren." Trial Court Opinion, 9/16/14, at 11. The trial court found that, "[a]ll of [the Children's] stability revolves around [Father's] household and, in fairness, the established visitation schedule with their Mother." *Id.* at 10. In addition, the trial court found that Mother "does not presently have a home in which the [C]hildren could be placed even if the [c]ourt were inclined to do so." *Id.* at 12. The trial court found that Mother's present residence "is red tagged[5] and she offered no specific plans for moving to another property which she owns in Hollidaysburg located near the Father." *Id.*

_____

[4] The trial court found that Section 5328(a)(5) and (6) did not favor either party. Further, it found that Section 5328(a)(7) and (11) are not relevant to this case.

[5] Mother acknowledged on cross-examination that the gas for her home was red-tagged, or shut off, during the past winter and remained red-tagged at the time of the subject proceedings. N.T., 8/26/14, at 102-103, 133-134.

With respect to Section 5328(a)(9), *i.e.*, assessing which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the [C]hildren adequate for their emotional needs, the trial court found that, "Mother is so caught up in her own issues, bogged down by her own difficulties, and unable to maintain structure … that she can make no case she would be remotely equal to [ ] Father who demonstrates all those qualities in abundance." Trial Court Opinion, 9/16/14, at 14.

The trial court summed up its decision to deny Mother's petition for modification of the existing custody order by stating as follows.

> In closing, as we noted in December 2010, this is an extremely difficult Opinion to write. No fact finder or [c]ourt could take pleasure in confronting this Mother with the harsh reality of her own behavior when, in fact, we are convinced she has very little control over it due to her mental health issues. However, we cannot change the fact that custody opinions are about the best interest of children and not in the best interest of a mother who clearly needs to be affirmed and feels she has been taken advantage of by everyone involved at every opportunity. The best we can do for this Mother is affirm that we believe her intentions are good. Her performance and demonstrated abilities, however, establish overwhelmingly that the best interest of the [C]hildren lies with remaining in the primary [physical] custody of their Father.

*Id.* at 20.

Upon careful review of the certified record, including the notes of testimony, the parties' briefs, the trial court opinions entered September 16, 2014, and January 26, 2011, and the applicable law, we discern no error of

law or abuse of discretion by the trial court in its custody decision.[6]

Accordingly, we adopt the trial court's opinions as dispositive of Mother's issues on appeal. **See** Trial Court Opinions, 9/16/14 and 1/26/11. The parties are directed to attach a redacted copy[7] of the trial court's opinions in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/15/2015

_____

[6] To the extent Mother argues that the trial court erred by describing her mental health condition within the context of Section 5328(a)(14), the history of drug or alcohol abuse of a party, we conclude that this error was harmless. The subject proceedings did not reveal any drug or alcohol abuse by either party. Likewise, the trial court did not find any drug or alcohol abuse by Mother or Father. We recognize that the trial court discussed Mother's mental health in the context of Section 5328(a)(14), rather than under Section 5328(a)(15), the mental and physical condition of a party, but we conclude that it did not result in any prejudice to Mother as drug or alcohol abuse by either party was not a basis for the trial court's conclusion.

[7] The copies shall include the redacted names of Mother, Father, and the Children.

C.S.                                    :        COURT OF COMMON PLEAS OF
                                        :        BLAIR COUNTY, PENNSYLVANIA
            Plaintiff                   :
                                        :
        vs.                             :        07 GN 6039
                                        :
T.S.                                    :
                                        :
            Defendant                   :

. . . . . . . . . .

HON. HIRAM A. CARPENTER III              PRESIDING JUDGE

EDWARD E. ZANG, ESQUIRE                  COUNSEL FOR PLAINTIFF

LUCAS KELLEHER, ESQUIRE                  COUNSEL FOR DEFENDANT

. . . . . . . . . .

## OPINION AND ORDER

This matter comes before the Court on request of the mother for an Evidentiary Hearing to determine custody of the parties' children, A.S. born November 14, 2000, and J.S. born February 22, 2006. An Evidentiary Hearing was held to a conclusion on December 21, 2010. We interviewed A.S. on December 22, 2010. The record is closed and the case is ready for decision.

At the outset, we note that although the mother petitioned for this evidentiary hearing, each of the parents believes the parties' present custody arrangement reflected by the Court Orders of September 1, 2009, and June 21, 2010, are not serving the best interest of these two minor children.

From the mother's perspective, she believes that an Order either establishing her as the primary custodian or reflecting a custody arrangement closer to 50/50 would be best. She also believes the father's extensive use of babysitters when he is working is not in the chilchildren chi9ld

17a

children's best interest and those times should be spent with her. The mother has little respect for the father.

She has a firmly entrenched belief the father is not 'there" for the children. The mother suffers from a personality disorder which is a major factor in the case.

The father presents as having made reasonable efforts to work with the mother where custody is concerned to little avail. Presently, he believes the numerous exchanges involved in implementing the present custody Orders are not in the best interest of the children. He suggests the mother's time be reduced to one night a week for a few hours together with every other weekend.

The case was unusual in that the father's former counsel (Attorney Lee Sill) testified as to the circumstances surrounding their September 1, 2009, Order. The mother believes she was taken advantage of in that negotiation by father's counsel when she was unrepresented. Although we heard this testimony, it is not critical to our determination for two reasons. First, if the mother offers the testimony to demonstrate it was always her intention to serve as primary custodian, we would believe her even without this testimony. We do not question the mother's sincere interest in the children irrespective of whatever Order might have been entered on September 1, 2009. Second, significant time has passed (over sixteen months) since that Order was entered. Simply put, the case is not about whether the Order entered in September, 2009 was appropriate – rather, the case is about the best interest of the children as we sign this Opinion and Order in January, 2011. Finally, while our observation of the mother at our hearing of December 21, 2010, suggests that negotiating with her was risky, we acknowledge we did not see her in September, 2009 nor were we a party to what extent other family members may have been involved on her behalf in helping her understand the document to which she "agreed." In any case, we are

2  18a

neither bound by the September 1, 2009, Order not do we conclude from it that the mother was "abandoning" her children.

Finally, we interviewed A.S. as part of the case. We will discuss that interview later in this Opinion.

As always, our paramount concern in a case whether it involves custody or visitation is the best interest and permanent welfare of the child. Commonwealth ex rel Pierce v. Pierce, 493 Pa. 292, 426 A.2d 555 (1981). All other considerations are deemed subordinate to the child's physical, intellectual, moral and spiritual well being. In the interest of Tremayne Quame Idress R., 429 A.2d 40, 43 (1981). Parents do not have a property right in their children. Whatever claim they may make for either custody or visitation rights, is to be tested by what is in the best interest of the child. See generally, Commonwealth ex rel Children's Aid Society v. Gard, 66 A.2d 300 (1949). A custody decree is not meant to punish a parent or anyone else, its only purpose is to help the child. In Re: Custody of Temos, 450 A.2d 111 (1982). The clear trend has been to abolish presumptions in custody disputes. In child custody cases, the Court must continually hew to the polestar of a child's best interest eschewing presumption and surmise. Morris v. Morris, 412 A.2d 139, 141 (1979). The Court should avoid mechanical determinations and focus its analysis on a close scrutiny of all particular facts relevant to determining the child's best interest. In Re: Custody of Hernandez, 376 A.2d 648, 653 (1977). Further, the ability to care for a child is to be determined as of the time of the custody hearing, not as of an earlier time. In Custody of Frank, 423 A.2d 1229 (1980). Decisions must be made on the basis of current facts and not the past conduct of the parties. In Re: Leskovich, 385 A.2d 373 (1978). The primary concern in custody matters lies not with the past but with the present and future. Hooks v. Ellerbe, 390 A.2d 791 (1978). Facts at the time of hearing

3   19a

are the foundation for the determination of the Court. Augustine v. Augustine, 312 A.2d 477 (1974). Past conduct is not relevant unless it will produce an ongoing negative effect on the child's welfare. In Re: Leskovich, supra. At hearing, each parent shares the burden of proving by a preponderance of the evidence that an award of custody to him or her would serve the best interest of the child. Ramos v. Rios, 378 A.2d 400 (1977). The burden of proving superior fitness as a parent rests equally with both parties. In Re: Custody of Hernandez, supra. In considering a change, the trial court is required to consider the advantages and risks where the minor child is concerned. Continuity and stability are important elements in a young child's emotional development. Commonwealth ex rel Jordan v. Jordan, 448 A.2d 1113 (1982). The fact that a stable, long-continued and happy relationship is developed between the child and one parent may be of critical importance to the formulation of an appropriate decree. Pamela J.K. v. Roger D.J., 419 A.2d 1301. However, while stability is a factor, it is not the sole criteria in a custody action. The fact that a child has not lived with a parent for a considerable length of time will not alone defeat that parent's right to custody. In Re: Custody of Hernandez, supra. The obstruction of a non-custodial parent's right to contact with a child is an extremely serious matter, especially when it violates Court-ordered visitation or partial custody. Pamela J.K. v. Roger D.J., supra. A custodial parent's obstruction of the non-custodial parent's right to visit the child may serve as the basis of an Order changing custody. Pamela J.K. v. Roger D.J., supra. Additionally, where shared custody is being considered by the Court four criteria are set forth for the hearing consideration. In Re: Wesley J.K., 445 A.2d 1243 (1982).

4  20a

## DISCUSSION

At the outset, we acknowledge that the mother's mental health condition and her resultant behaviors are the key issues in this case. They are matters of great concern to everyone involved. They affect both her thought process and her judgment. They also affect her attitude toward the father. This last finding as to her ability to work with the father is critical. A 50/50 sharing of custody requires considerable ability on the part of the parents to work together. In this case, we have exactly the opposite situation. In fact, not only is there an absence of respect and cooperation with the father there is deliberate undermining of his role.

After hearing the case, we are satisfied of the father's good intentions; his willingness to work with the mother; his willingness to work with the extended family; and his high level of involvement with the children. The mother acknowledges none of this. Instead, her testimony suggests that the father was not there for the children and that he abandons them for babysitters when he was working. She suggests he has been involved in relationships which are detrimental to the children despite his obvious high level of involvement and interest. This represents exactly the type of situation where a 50/50 sharing of custody traditionally does not work. Indeed, were we to implement such an arrangement we are satisfied it would not be in the best interest of these children. There is also the matter of the mother's decision making. Restricting ourselves to the two years preceding our hearing, the mother has entered the father's home unauthorized, stolen property from that residence, required the father to seek a PFA simply to protect his privacy, received a DUI charge and repeatedly made questionable decisions in most aspects of her life where relationships (including her relationship with the children) are concerned.

matter what efforts the father (or the mother's extended family) would make they would not be enough.

The reality is that rather than a 50/50 sharing of parental duties these children need a parent who is in charge. That parent has to be the father. Fortunately, the father is well positioned to accomplish the role. He has made considerable adjustments with his work in recent months which allow him to be home much more with the children. He is in all other respects willing and able. He is willing to work with the mother (as best anyone can) whatever Order the Court enters in spite of the mother's undermining his attempts at new relationships and generally making a nuisance of herself in his personal life.

Children need stability, permanence, consistency, and support. They also need to be kept out of custody cases. They are not getting that under the present arrangement. Unfortunately, the mother's unpredictable behavior extends to them. Recently, the mother has returned the children to the father on two occasions because of her inability to adjust to behavior by the children she did not approve. This included most recently returning A. S, to the father together with three bags of her clothes on Thanksgiving Day as a punishment. The message that is sent by such an action is not one of discipline but rather one of rejection. This type of impulsive action by the mother is the rule and not the exception. One need only read her E Mails to the father (of record in the case) and listen to her testimony to see how fixed her views are and how impulsively she will act on them. While we would never accuse the mother of being deliberately physically dangerous to the children, we have no hesitancy in declaring her behaviors dangerous to their mental health and well being.

 

For all of these reasons, we reach the same (unfortunate) conclusion that the father reluctantly offered. That is, that the mother's time with the children must be reduced given the consistent stability, permanence, and support children need.

This decision is regrettable and unpleasant. We are aware the mother has supportive parents and siblings who would offer every assist. However, we cannot help but observe that this same extensive support system was in place when she committed every single misjudgment which has occurred in the approximately two and one half years leading up to this hearing. Simply put, the mother is unable to control her behaviors notwithstanding a support system which is there to prevent them.

Finally, we interviewed A.S. That interview (unfortunately) was also revealing of the mother as we described her. It was clear A.S. did not want to be interviewed. She was clinging to her mother as tightly as her mother seemed to be clinging to her as we approached her. She left her mother's side only when she was advised by the mother that the Court was "on our side." Given A.S.'s level of fear, we needed to know why she was afraid. We asked A.S. what she thought we would talk about. She told me "you just want to meet me" and to discuss with her "where she would be residing." Of course, those of you in the room (Counsel and extended Family) will recall that we did tell everyone we wanted to "meet A.S." but we would not be discussing with A.S. where she wanted to live. There is no nuclear rocket science involved in concluding the mother planted this seed with A.S. None of this is surprising as we have observed the mother. She clearly has trouble interpreting what she hears and maintaining clear thinking.

Unfortunately, we acknowledge our decision will undoubtedly be hard on the mother. Much like the father when he testified that he was pleased to see the mother

7 23a

involved in new male relationships because they could make her more stable, we suspect the children provide an anchor for her as well. However, our test is not what will help the mother – our test is what helps the children. We would recommend to the mother that she counsel so she can function more appropriately and become a better role model for the children. If there is to be growth in the ability of the mother to offer these children some level of consistency it lies in getting help.

Accordingly, consistent with all of the above, we enter the following Order.

1. The father shall have the legal and physical custody of both the parties' minor children.

2. The children shall reside primarily with the father.

3. The mother shall have periods of partial custody every Wednesday during the school year from 3:30 p.m. until 7:00 p.m..

4. During the summer months, when the children are out of school, the mother shall have every Wednesday from 9:00 o'clock a.m. until 8:00 o'clock p.m..

5. The mother shall have partial custody from 3:30 p.m. every other Friday until Sunday at 6:00 o'clock p.m. year round.

6. The mother shall have one week of vacation with the children in the summer where her regular weekend visitation will be extended from Friday at 3:30 until the following Friday at 3:30.

7. The parties shall share Holidays by agreement. However, in no event will the mother have less than four hours with the children on the Holidays of Christmas, Thanksgiving, and Easter. Memorial Day, the 4th of July, and Labor Day will be rotated. In odd numbered years the mother shall have Memorial Day and Labor Day from 8:00 a.m. until 9:00 o'clock p.m. The father will have the 4th of July

8

Holiday. In even numbered years the father will have Memorial Day and Labor Day and the mother will have the 4th of July from 9:00 o'clock a.m. until after the fireworks when they would be returned to the father.

8. Transportation shall be shared with the party having the children to drop them off at the drop-off point. Transfers shall take place at a public store such as a Sheetz convenient to the parties by mutual agreement. Both parents may designate an adult to perform transportation if their personal attendance is prohibited.

9. The children shall be with the mother on Mother's Day from 9:00 o'clock a.m. until 6:00 o'clock p.m. and with the Father on Father's Day from 9:00 o'clock a.m. forward. The schedule for these days will take precedence over the normal schedule.

10. The children's birthday will be spent with whoever has the child on that day.

11. Each party shall keep the other informed of their current address and telephone number.

12. Each party shall have access to school performance and medical care which shall be done through the schools and the medical providers who are directed to provide the information to both parents.

13. Neither party shall engage in any conduct which presents to the children a negative or hostile view of the other, nor shall they allow any third party to act in such a manner that would hamper the natural love and respect of the children for either parent.

14. The parties may decide different time arrangements and make decisions for the children whenever they mutually agree to do so. Nothing in this Agreement is understood to limit or restrict the ability of the parties to mutually agree on

9    25a

alternative parenting arrangements. If for any reason, the parties cannot agree, the terms of this custody agreement will be followed.

15. ALL HOLIDAY SCHEDULES SHALL SUPERSEDE ANY OTHER TIME ARRANGEMENTS UNLESS THE PARTIES MUTUALLY AGREE TO DO OTHERWISE.

16. VIOLATION OF THIS ORDER BY ANY PERSON MAY RESULT IN CIVIL AND CRIMINAL PENALTIES, INCLUDING PROSECUTION PURSUANT TO SECTION 2904 OF THE PENNSYLVANIA CRIMES CODE, INTERFERENCE WITH CUSTODY OF CHILDREN.

17. Jurisdiction of the children shall remain with the Court of Common Pleas of Blair County, Pennsylvania, unless or until jurisdiction would change under the Uniform Child Custody Jurisdiction Act.

BY THE COURT,

_____

SA

FILED: _____1/26/11_____

26a

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

C.S.                                    :
            Plaintiff                   :
                                        :
    v.                                  : NO. 2007 GN 6039
                                        :
T.S.                                    :
            Defendant                   :

HON. HIRAM A. CARPENTER, III   SENIOR JUDGE

EDWARD ZANG, ESQUIRE           COUNSEL FOR PLAINTIFF

TERRY DESPOY, ESQUIRE          COUNSEL FOR DEFENDANT

## OPINION AND ORDER

This matter comes before the Court on request of the Mother for an evidentiary hearing to determine custody of the party's children - A.S.              , born November 14, 2000 and J.S.              , born February 21, 2006.  An evidentiary hearing was held to a conclusion on August 26, 2014.  The record is closed and the case is ready for decision.

Essentially, the Mother comes before the Court offering that an order entered establishing her as the primary custodian of the minor children would be in their best interest.  The Mother offered a number of reasons why she believes this is true.  Although the Mother's presentation was somewhat hard to follow (and inconsistent in certain regards) her "main" argument for a change in custody is the Mother's belief she is

more available to the children than the Father due to his need to work and resulting use of babysitters to supervise the children.

In response, while the Father agrees he is required to use babysitters and does have to work as the only means of supporting the children financially, he does not believe a change in primary custody is presently indicated. On the contrary, he believes the present arrangement which has been the order in the case since our Opinion of January 26, 2011 should be continued in all of its particulars.

As always, our paramount concern in a case whether it involves custody or visitation is the best interest and permanent welfare of the children. Commonwealth ex rel Pierce v. Pierce, 493 Pa. 292, 426 A. 2d 555 (1981). All other considerations are deemed subordinate to the child's physical, intellectual, moral and spiritual well being. In the interest of Tremayne Quame Idress R., 429 A.2d 40, 43 (1981). Parents do not have a property right in their children. Whatever claim they may make for either custody or visitation rights is to be tested by what is in the best interest of the children. See generally Commonwealth ex rel Children's Aid Society v. Gard, 66 A.2 300 (1949). A custody decree is not meant to punish a parent or anyone else. Its only purpose is to help the child. In Re: Custody of Temos, 450 A.2d 111 (1982). The clear trend

2

-22-

has been to abolish presumptions in custody disputes. In children custody cases, the Court must continually hew to the polestar of a child's best interest eschewing presumption and surmise. Morris v. Morris, 412 A.2d 139, 141 (1979). The Court should avoid mechanical determinations and focus its analysis on a close scrutiny of all particular facts relevant to determining the child's best interest. In Re: Custody of Hernandez, 376 A.2d 648, 653 (1977). Further, the ability to care for a child is to be determined as of the time of the custody hearing, not as of an earlier time. In Custody of Frank, 423 A.2d 1229 (1980). Decisions must be made on the basis of current facts and not the past conduct of the parties. In Re: Leskovich, 385 A.2d 373 (1978). The primary concern in custody matters lies not with the past but with the present and future. Hooks v. Ellerbe, 390 A.2d 791 (1978). Facts at the time of hearing are the foundation for the determination of the Court. Augustine v. Augustine, 312 A.2d 477 (1974). At hearing, each parent shares the burden of proving by a preponderance of the evidence that an award of custody to him or her would serve the best interest of the child. Ramos v. Rios, 378 A.2d 400 (1977). Continuity and stability are important elements in a young child's emotional development. Commonwealth ex rel Jordan v. Jordan, 448 A.2d 1113 (1982).

-23-

The principles enunciated above are time honored in Pennsylvania law. More recently, however, as a result of the Pennsylvania's adoption of the new Child Custody Act at 23 Pa.C.S.A. §5328(a), that act directs that when a party files a petition for modification of a custody order, the trial court must perform a "best interest of the child" analysis considering all of the Section 5328(a) factors. Those factors are as follows:

1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

3) The parental duties performed by each party on behalf of the child.

4) The need for stability and continuity in the child's education, family life and community life.

5) The availability of extended family.

6) The child's sibling relationships.

7) The well-reasoned preference of the child, based on the child's maturity and judgment.

8) The attempts of a parent to turn the child against other parent, except in case of domestic violence where reasonable safety measures are necessary to protect the child from harm.

9) Which party is more likely to maintain a loving,

stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

10) Which party is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of the child.

11) The proximity of the residences of the parties.

12) Each party's ability to care for the child or ability to make appropriate child-care arrangements.

13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness of inability to cooperate with that party.

14) The history of drug or alcohol abuse of a party or member of a party's household.

15) The mental and physical condition of a party or member of a party's household.

16) Any other relevant factor.

As the language of the Act suggests, these factors are not the only factors a Court may consider. However, they are to be included as part of the analysis.

## DISCUSSION

At the outset, we acknowledge this Court also heard this matter previously at a custody evidentiary proceeding over three and a half years ago on December 21, 2010 and December 22, 2010 to a conclusion. We incorporate that Opinion in its

5

-25-

entirety as part of our current Opinion. Indeed, based on the record created at the present hearing that Opinion remains extremely accurate as to the issues in the case and, given this opportunity, we would not change a single word of our earlier writing (notwithstanding the passage of almost four years) as accurately reflecting the situation both as it existed then and as it exists now. In fact, most of the Mother's presentation involved a repeat of what we heard at that time.

In updating the matter, which is essentially what occurred at this hearing, this can be fairly accomplished using the statutory custody factors as our format. Accordingly, we proceed to a discussion of the individual factors as the format for this Opinion.

**1)   Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.**

This issue clearly favors the Father. In fact, the Father's testimony that he receives many requests for additional time beyond the every Wednesday and every other weekend time which is presently ordered for the Mother is confirmed by her. The Father's response to those requests is telling as to his attitude. Since the requests are numerous, he evaluates them on a case by case basis. He tries to be fair considering what people are involved in the extra time, what activities might be fun for the children with their Mother, the

event or situation which triggers the request for additional time, and his own plans (if any). Frankly, this response by the Father is not only reasonable but commendable given what he is confronting - namely, actions on the part of the Mother which would make most parents "over the edge" and probably involve the police. We site to two specific examples from the testimony which are typical of what this Father is forced to confront. The first is the Mother's admission she appears at the Father's house on numerous occasions (and randomly) to get the children off to school even though the children reside with him. To accomplish this, she not only waits at the bus stop but goes to the Father's home and knocks on the door. In her testimony, the Mother not only confirms this behavior but believes it is justified as "she just wants to see the kids". It could hardly get more obtuse than that. Despite this clear invasion of his privacy and his own demonstrated ability to get the children off to school in an orderly fashion, the Father is remarkably poised and restrained in dealing with this. The Father is clearly sensitive to the Mother's situation, her impulsive tendencies, and her consistent behavior which suggests she does not understand the consequences of her actions (all confirmed by her mental health records).

For her part, the Mother, while offering she would "be flexible", has shown herself to be anything but. At hearing,

the Father produced Defendant's Exhibits #1 and #2 as examples of the difficulty in working with the Mother. The bottom line of these exhibits shows that when the Father wished to move the pick up time for the Mother from summer camp one-half hour on Friday to allow A.S. to participate in a field trip while offering one-half hour on Sunday at the time of the children's return (to balance any loss of time) he met with resistance. To encounter that over such a simple change which could be so fairly implemented and was so well explained in counsel's July 5, 2011 proposal offers a concrete basis for a conclusion the Mother, in fact, lacks flexibility where the children are concerned. Nothing has occurred since that incident which suggests otherwise. In fact, the Father offers he has "given up" trying to ask for any flexibility in the order so it is all on his shoulders if any flexibility is to be achieved.

That reality which the Father confronts is certainly a large (and justifiable) reason why he was resistive to counsel for the Mother's overtures that the Mother be used more during periods when babysitters are involved than she is presently. In fact, the Father testified he had attempted this and it had been a "disaster" as he characterized it. Thus, the Father's request that the status quo continue to be the order while he attempts to achieve what flexibility he can working with the

8

-28-

Mother while at the same time having some control over the situation makes sense.

2)     The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

Neither of these parents claims that abuse is a major issue in the case.  The Mother does, however, question the safeguards and supervision provided by the Father in his use of babysitters.  In this regard, the Mother has not hesitated to be an active intervenor by going to the Father's home (without permission), checking on who is doing the babysitting, and on at least one occasion per the Mother's testimony getting "into it" with the mother of one of the babysitters.  All this is again indicative of the Mother's impulsive behavior and lack of consideration of the consequences of that behavior.

Seen from this perspective, the Mother's intrusiveness makes this more difficult for the Father in attempting to achieve an orderly situation for the children while providing the supervision necessary for him to work.  Indeed, the Mother's interventions seem to know no boundaries.  Even the day of this hearing she had been at the Father's home as the children were leaving (since it was the first day of school) without permission and unannounced.  While this may or may not constitute some form of abuse by the Mother, this type of

intervention by her is both typical and viewed by the Mother as appropriate. The Father deals with it as best he can while offering that the Mother's unannounced appearances do make A.S. anxious - especially since the visits can be accompanied by argumentative behavior.

3) The parental duties performed by each party on behalf of the child.

While the parties were together (prior to our 2010 hearing) the Father supported the Mother's primary role. Presently, the Father clearly performs all duties and there is nothing to suggest the children are neglected in any way or have any issues in his household, at school (where both are remarkably successful), or with their babysitters from his perspective.

4) The need for stability and continuity in the child's education, family life and community life.

This factor favors the Father overwhelmingly. The children have now spent the majority of their school time in the primary custody of their Father. All of their stability revolves around his household and, in fairness, the established visitation schedule with their Mother. While the Mother offers that the children need family and religion and that they are not getting the latter, the fact is she does not take them to church when she has them on Sunday herself as she testified. As to the performance of parental duties, no claim is made by

10

-30-

the Mother that the Father is not providing adequate care in any specific regard.

While we will discuss the Mother's mental health issues later in this Opinion, it is more than fair to say those difficulties impact dramatically the stability and continuity which she could offer the children. Indeed, basic concerns as to the children being where they need to be, when they need to be there, and with the appropriate tools for the event are all issues were they in their Mother's care. In fact, the Mother demonstrated real difficulty simply staying focused and on task in response to counsel's questions (this is repeated over and over again in the record). Her inability to stay on task on any particular current issue as opposed to relapsing into old themes and behaviors (all of which occurred prior to our December 2010 hearing) was the overwhelming impression listening to her testimony. In fact, the Mother clearly believes everything which occurred since 2010 was contrary to establishing stability and continuity for the children and was based on lies, alterations of court records, her being taken advantage of by counsel, and her being manipulated by the Father through the court system. Her beliefs in this regard are fixed and unchanging. We heard them in detail in December 2010 and listened to them repeated (no matter what the original question was) again and again at our hearing. It is hard to

believe a mother so fixated and suffering from the obvious intellectual deficits from which this Mother suffers with resulting impulsive behavior could provide stability and continuity for children of this age.

Beyond that, primary residential custody for now could be fairly decided without more on the basis the Mother does not presently have a home in which the children could be placed even if the Court were inclined to do so. Her present residence is red tagged and she offered no specific plans for moving to another property which she owns in Hollidaysburg located near the Father. At hearing, she testified both ways in response to questions regarding the children's schooling. First, she offered she would use Baker School at her present residence while later offering she would fix the home up in Hollidaysburg and move there so the children could maintain their present school district in Hollidaysburg. This type of presentation is not reassuring when the home where she has resided the past twenty-five years is presently red tagged with no explanation by the Mother how or why she allowed that to occur or what plan she has to remedy the situation. Compared to the Father's stable residence, the alternative offered by the Mother is chaotic to say the least.

5) The availability of extended family.

Both extended families are available and important to the children. While none of the extended family appeared at our hearing, we have every reason to believe they are interested and (especially on the Mother's side) supportive of these children (if not the Mother's custody of them).

6) **The child's sibling relationships.**

The children's sibling relationship involve entirely their interaction with each other. The Father resides with the two children. There is no one else residing in his residence. The Mother has had significant others in the past but presently resides alone (except when the children are with her). The children spend all of their time with their Father together as well as the Mother's visitation periods. We heard nothing to suggest the relationships between them are not normal and appropriate between a girl entering eighth grade and a boy entering third grade.

7) **The well-reasoned preference of the child, based on the child's maturity and judgment.**

We did not interview the children in this case at the request of the parents. We agree with that decision. Frankly, this is not (and may never be) a child preference case.

8) **The attempts of a parent to turn the child against other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.**

-33-

While neither parent made a claim the other parent was trying to turn the children against them, the Mother's behavior of appearing at the Father's household uninvited, unexcused, and remaining there even after being requested to leave on some occasions certainly create a possible issue in terms of both parents' relationships with the children over time.

9) **Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.**

As to maintaining a loving relationship, both of these parties are committed in that regard. The problem where the Mother's request for primary custody is concerned is that there is no real basis to believe the relationships if she were primary custodian would be stable, consistent, and nurturing. The Mother is so caught up in her own issues, bogged down by her own difficulties, and unable to maintain structure (even when testifying in a court environment) that she can make no case she would be remotely equal to a Father who demonstrates all those qualities in abundance. In fact, the Father's stability at work, consistency with the children, and tolerance of many of the Mother's behaviors while acknowledging the children enjoy their time with her all speak to his superiority on this issue.

10) **Which party is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of the child.**

14    -34-

This is clearly the Father for all of the reasons stated to this point in this Opinion (and the additional reasons which will follow later). In fact, there is no suggestion by anyone the children's needs are not being met presently. Further, there is no claim the children have any special needs beyond those needs children in their age group would normally experience.

11) **The proximity of the residences of the parties.**

In terms of the present custody arrangement, distance is not a factor in the case since it appears to limit neither party in implementing the current schedule. If the Mother moves from Altoona closer to the Father, while this may cause an increase in problems for the Father in maintaining his household (due to the Mother's invasion of it) it would not impact a custody schedule. Of course, the Mother's inability to move into the home in Hollidaysburg would be an issue regarding the children attending school there and their situation become somewhat problematic were we to transfer custody since we do not really know where the Mother would actually reside.

12) **Each parent's ability to care for the child or ability to make appropriate child-care arrangements.**

The Father is well grounded as to what he must do to maintain his household. It is apparent he is devoted to the

-35-

15

children one hundred percent when he is not working. Otherwise, a combination of school, daycare, camps, and babysitters fill in the blanks.

From the Mother's standpoint, clearly she is basically available for the children full time and seems to possess the ability to use family members and others when necessary. None of this appears to be inappropriate in any particular.

13) **The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.**

The Father appears before the Court (just as he did in December 2010) as remarkably restrained in dealing with this Mother and willing to continue on that course. Meanwhile, the Mother continues her same patterns described in our earlier Opinion of disregarding the Father's role, invading his privacy, and generally making a nuisance of herself in his household. All the while, she continues her fixed belief that she has somehow "been abused" by everyone involved in this in terms of denying what she views as almost her right to custody. We do not see this changing so that the key to positive interaction between the parents falls on the Father despite the fact the Mother's actions do not always recognize his significance. One change from the earlier hearing in the Mother's testimony was that she several times referred to the

16

Father as a "good dad". This admission was not forthcoming from her earlier when we heard the matter in 2010. Notwithstanding, what might seem to be some progress in her recognition of the Father her actions speak louder than her words that the Father still stands accused of everything contained in our earlier Opinion.

14) **The history of drug or alcohol abuse of a party or member of a party's household.**

Frankly, this issue (without more) would cause the Court grave concern were we required to place these children with their Mother (let alone placing them there when the Father is behaving positively). The Mother, by her own descriptions, suffers from ADHD, PTSD, and trauma from her 1985 motor vehicle accident at age sixteen. While the ADHD and PTSD were not established as the diagnosis in the medical records, the impulsive behavior, acting without regard to consequences, and disorganized thinking on the part of the Mother which are documented in the mental health records were on full display both through the Mother's testimony and reviewing her actions where the children are concerned. In this regard, this Opinion is almost cruel to the Mother in that we do believe she wants to do none of these things and is, in fact, well intended toward the children. The fact this is our belief, however, does not change the fact the Mother is simply unable to perform

17
-37-

in a manner which demonstrates acceptance of the present situation, support of the Father, or (lacking the first two) an ability on her own part to truly serve as primary residential custodian at this point in time together with the Father.

15)  The mental and physical condition of a party or member of a party's household.

Consistent with the above, it is apparent the current situation should be maintained.  When everything is considered, not only does the Mother fail to demonstrate her own capacity to serve as primary residential care parent but there is a clear showing the children are doing well in the custody of their Father (babysitters notwithstanding).  In fact, we believe to change residential custody now would be little more than disastrous since we would be removing the main source of stability from the children's lives.  Accordingly, we affirm the current order in all of its particulars.

In taking this action, we recognize this continues the Mother's present difficulty which she expressed at hearing that the Father is limiting her Wednesday night visits by scheduling a cheerleading camp for A.S.  on Wednesday evening.  While this is regrettable, the Mother's claim that this is something deliberately set up by the Father is simply untrue.  In fact, the Father outlined in detail the importance of competitive cheerleading to A.S. and how the combination of changing teams

-38-

and the coach changing nights evolved into a situation where beginning this summer A.S.'s practices were scheduled on Wednesday night. Given that reality, the Father (because of his work) could not get A.S. to the Wednesday practices so if he offered the Mother a different night than Wednesday A.S. simply cannot go to cheerleading. In effect, he gave the <u>Mother</u> the <u>choice</u> as to whether or not A.S. would go by leaving it on her night. It would be easy enough for A.S. to simply be removed from competitive cheerleading if this is the Mother's wish on her evening. We affirm that. It seems to us the Father is empowering the Mother to make the decision how her evening with the children is spent. If we give the Mother a different night, A.S. cannot go to her cheerleading in any event since the Father cannot get her there. It is about that simple and we leave it to the Mother whether A.S. goes to cheerleading or whether she does not. At hearing, although we invited an alternative solution, no one offered one.

In closing, as we noted in December 2010, this is an extremely difficult Opinion to write. No fact finder or Court could take pleasure in confronting this Mother with the harsh reality of her own behavior when, in fact, we are convinced she has very little control over it due to her mental health issues. However, we cannot change the fact that custody

opinions are about the best interest of children and not in the best interest of a mother who clearly needs to be affirmed and feels she has been taken advantage of by everyone involved at every opportunity. The best we can do for this Mother is affirm that we believe her intentions are good. Her performance and actual demonstrated abilities, however, establish overwhelmingly that the best interest of the children lies with remaining in the primary residential custody of their Father.

BY THE COURT:

FILED: Sept. 15, 2014
ajh